[S.F. No. 23153. In Bank. Mar. 25, 1975.]

WILLIAM D. SPRUANCE, a Judge of the Municipal Court, Petitioner, v.
COMMISSION ON JUDICIAL QUALIFICATIONS, Respondent.

**COUNSEL**

Mintz, Giller, Himmelman & Mintz, Herman W. Mintz and Leland J. Bruzzone for Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and Linda Ludlow, Deputy Attorneys General, for Respondent.

**OPINION**

**THE COURT**—The Commission on Judicial Qualifications (hereinafter the Commission) has recommended the removal from office of Judge William D. Spruance of the Municipal Court for the San Leandro-Hayward Judicial District of Alameda County.[1] Pursuant to rule 920 of the California Rules of Court,[2] Judge Spruance has petitioned this court

---

[1]The California Constitution, article VI, section 8, provides in pertinent part: "The Commission on Judicial Qualifications consists of 2 judges of courts of appeal, 2 judges of superior courts, and one judge of a municipal court, each appointed by the Supreme Court; 2 members of the State Bar who have practiced law in this State for 10 years, appointed by its governing body; and 2 citizens who are not judges, retired judges, or members of the State Bar, appointed by the Governor and approved by the Senate, a majority of the membership concurring. All terms are 4 years."

Article VI, section 18, subdivision (c), of the California Constitution provides: "On recommendation of the Commission on Judicial Qualifications the Supreme Court may (1) retire a judge for disability that seriously interferes with the performance of his duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than 6 years prior to the commencement of his current term that constitutes wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

[2]All references herein to specific rules are to the California Rules of Court. (See Cal. Const., art. VI, § 18, subd. (e).)

to modify or reject the Commission's recommendation. In discharging our solemn constitutional duties in this matter we have independently reviewed the entire record and have adopted with some modifications the findings of the Commission, as set forth seriatim hereinafter. We conclude that petitioner has engaged in inexcusable and reprehensible conduct constituting in some instances "wilful misconduct in office" (hereinafter wilful misconduct) and in other instances "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" (hereinafter prejudicial conduct). We accordingly adopt and hereby effectuate the Commission's recommendation of removal.

After practicing law for almost 20 years, petitioner campaigned for and was elected to the municipal court, taking office on January 4, 1971. On January 11, 1973, he was notified that the Commission had, on its own motion pursuant to rule 904, ordered a preliminary investigation of his judicial conduct. On July 13, 1973, petitioner was served with a five-count Notice of Formal Proceedings (rule 905) encompassing nineteen specifications of wilful misconduct and prejudicial conduct. Following petitioner's filing of a verified answer, this court on January 4, 1974, at the Commission's behest, appointed three special masters to hold evidentiary hearings. (Rule 907.)[3]

The 19 days of hearings before the masters commenced on February 19, 1974, and concluded on March 19, 1974. During the course of the proceedings, the examiners designated by the Commission to prosecute the charges against petitioner (rule 921(f)) received permission to strike three of the specifications in count I of the Notice of Formal Proceedings (counts I-C, I-D, and I-H). The masters filed their report on April 25, 1974, finding five specifications not proven (counts I-G, I-I, II-D, II-G, and IV). Of the remaining eleven specifications, six were found to constitute both wilful misconduct and prejudicial conduct (counts II-A, II-B, II-C, II-F, III, and V), three were found to constitute wilful misconduct (counts I-E, I-F, and II-E), and the final two specifications were found to constitute prejudicial conduct (counts I-A and I-B). The masters, who also made findings concerning factors in mitigation, unanimously recommended that petitioner be censured.

After considering the masters' report (rule 912), written objections

---

[3]The special masters so appointed were Alvin E. Weinberger, retired Judge of the Superior Court of the City and County of San Francisco (presiding master); Albert A. Axelrod, retired Judge of the Municipal Court of the City and County of San Francisco; and Sidney Feinberg, Judge of the Municipal Court for the Palo Alto-Mountain View Judicial District of Santa Clara County.

thereto (rule 913), which were filed only by the examiners, and oral arguments (rule 914), the Commission, on July 16, 1974, issued its own findings of fact, conclusions of law and recommendation. (Rules 918 and 919.) By unanimous vote (save for a seven-to-two vote as to count I-A) the Commission adopted the masters' findings of fact concerning the eleven specifications found proven by the masters. The Commission unanimously concluded that these proven specifications constituted wilful misconduct. The Commission dismissed the five charges the masters found not proven,[4] as well as the three charges which had been stricken. The Commission made no findings concerning mitigation. By a five-to-four vote the Commission recommended to this court that petitioner be removed from office. (Rule 917.) Petitioner was thereby disqualified from acting as a judge for as long as the Commission's recommendation of removal remained pending before this court. (Cal. Const., art. VI, § 18, subd. (a).)

Following the procedure set forth in *Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270 [110 Cal.Rptr. 201, 515 P.2d 1], we granted a writ of review to examine the Commission's findings of fact, conclusions of law, and recommendation of removal. Since the ultimate, dispositive decision to censure or remove a judge has been entrusted to this court, we felt it our responsibility "in exercising that authority . . . [to] make our own, independent evaluation of the record evidence adduced below." (*Id.,* at p. 276.) ■ ■■■■ In fulfilling that responsibility, we have examined in full detail the record of proceedings below and find in accordance with the Commission that the 11 specifications of misconduct not stricken or dismissed below[5] have been proven by "clear and convincing evidence" sufficient to sustain them "to

---

[4]The first part of count II-D, which overlaps part of count I-F, was considered and determined by the masters as a part of count I-F. The remaining allegations of count II-D were found to be not proven. The Commission, combining both counts, made findings pertaining solely to the charges involving count I-F. In the absence of any additional findings, we deem the remaining aspects of count II-D to have been impliedly dismissed by the Commission.

[5]Among the arguments addressed to the court in this case is one of first impression which we feel should be answered directly. The examiners have argued that the dismissal by the Commission of certain of the specifications of misconduct by petitioner should not necessarily be accorded conclusive effect. The examiners contend that two of the dismissed specifications (counts I-G and I-I) were proven by clear and convincing evidence and constitute conduct for which the Constitution authorizes the imposition of discipline (see *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at pp. 283-284) notwithstanding the fact that the Commission, in stating that the specifications were "not sustained," chose not to issue any findings of fact and conclusions of law. The examiners maintain that because we have undertaken to review the record ourselves and to adopt our own findings of fact and conclusions of law, it is within our power to find proven any of the charges lodged against petitioner upon which evidence was received

a reasonable certainty." (See *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 275.)

regardless of the Commission's disposition of such charges. We emphatically disagree.

The Constitution clearly makes our power to discipline a judge for misconduct "contingent on the Commission having so recommended." (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 276; Cal.Const., art. VI, § 18, subd. (c) [see fn. 1, *supra*].) It would be entirely inconsistent with this constitutional division of functions for us to consider in passing on the Commission's recommendation any allegations of prejudicial conduct or wilful misconduct other than those which formed the basis of that recommendation. Unlike our statutory and inherent constitutional powers to control the professional conduct of members of the bar (see Bus. & Prof. Code, § 6107; *In re Hallinan* (1954) 43 Cal.2d 243, 253-254 [272 P.2d 768]), our shared constitutional power to censure or remove a judge for misconduct does not permit us to impose such discipline on our own motion. (Cf. *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 276.)

Moreover, the examiners' argument overlooks the dual function which the Commission performs. When considering the masters' report and deciding upon its own findings of fact and conclusions of law, the Commission acts in an adjudicatory role with the prosecutorial function left to the examiners. (See rule 921(f).) But before us the Commission's role is exclusively that of an adversary, as the Commission is the respondent to the petition for a writ of review. (Rule 920(a).) The examiners appear before us merely as counsel to respondent. As such, the examiners are no more free than the Commission itself to argue against the validity of respondent's own adjudication of the facts and consequent conclusions of law. Its dismissal of certain of the specifications against petitioner having been based on its own evaluation of the evidentiary record in the light of the constitutionally ordained grounds for imposing discipline, the Commission is estopped from urging us, through counsel, to assess the record otherwise.

For the foregoing reasons we conclude that the Constitution as well as sound procedure compel us to predicate our adoption, modification, or rejection of the Commission's recommendation solely upon those specifications in the Notice of Formal Proceedings which the Commission found both to have been proven as a matter of fact and to have constituted constitutionally sufficient grounds for the imposition of discipline. It would make a mockery of the constitutional requirement that our imposition of discipline on a judge be contingent "[o]n recommendation of the Commission" (Cal. Const., art. VI, § 18, subd. (c)), for us to contemplate basing our adoption or modification of such a recommendation on conduct which the Commission has not considered in formulating its recommendation.

We wish to emphasize, however, that with respect to those specifications which have been found proven by the Commission and have been deemed by the Commission to be grounds for imposing discipline, and hence are properly before us in reviewing the Commission's recommendation that discipline in fact be imposed, we do not mean to intimate that this court gives dispositive effect to these determinations of questions of fact and law by the Commission. Such determinations are the condition precedent to our consideration of whether a judge is to be disciplined. This condition having been met, we regard it as established by *Geiler* that it is solely for this court to decide not only the question of fact whether the conduct in issue occurred but also, unfettered by the characterizations of the Commission, the question of law whether the proven conduct falls within the class of conduct for which the Constitution authorizes the imposition of discipline. (See *Geiler, supra,* 10 Cal.3d at pp. 276, 283-284.) We reserve decision whether we are similarly unfettered by the nature of the discipline recommended by the Commission, to wit, whether our power to "modify" a recommendation of the Commission (rule 920(a)) would allow us to impose greater rather than lesser discipline than that recommended, and thus to remove from office a judge whom the Commission has recommended merely be censured.

We turn now to a précis of the proven specifications of misconduct. As to each such specification, our findings of fact are set forth in the margin. Our findings are adapted, and in some instances adopted *in haec verba,* from those of the Commission.

Count I generally charged petitioner with having conducted his court in a bizarre and unjudicial manner. In particular, he was alleged to have treated attorneys in a cavalier, rude and improper manner. Count I-E charged that petitioner had subjected an attorney to improper cross-examination when the attorney took the stand in support of his motion to disqualify petitioner (Code Civ. Proc., § 170.6), and had improperly levied "witness fees" against the attorney as a condition to petitioner's disqualification of himself.[6] In count I-F petitioner was charged with

---

[6]Our findings for count I-E are as follows:

1. On or about August 11, 1972, the case of People v. Dutro was set for hearing on a preliminary examination in department 1 of the San Leandro-Hayward Municipal Court.

2. The petitioner who normally presided over department 5 of said court was on the day in question also presiding over department 1, and had been so presiding for approximately two weeks, substituting for Judge Robert Fairwell.

3. On at least two different occasions immediately prior to August 11, 1972, petitioner had indicated to different deputy district attorneys of Alameda County that he remembered Attorney Victor J. Gianunzio with some degree of displeasure and hostility because of an incident which occurred several years prior when petitioner was a private counsel representing a party in civil litigation and Mr. Gianunzio represented the opposing party.

4. Mr. Gianunzio represented the defendant Dutro at the preliminary examination, and when the case was called he made an oral motion supported by an oral statement under oath (Code Civ. Proc., § 170.6, subd. (2)) seeking to disqualify petitioner from hearing the matter.

5. The oral statement of Mr. Gianunzio alleged: (a) he did not know until the day of the hearing that petitioner was sitting in department 1; (b) some years previous to petitioner's taking the bench the two men had been on opposite sides of some civil litigation and, as a result of an incident during the course of that litigation involving him and the petitioner, the latter had been held in contempt; (c) subsequent to that incident and prior to petitioner's assumption of the bench, he had made overtures to petitioner through third parties to correct the misunderstanding that had arisen and such overtures had been rebuffed; and (d) he was informed and believed that petitioner had expressed an opinion that he (Gianunzio) had "better not appear in his Court."

6. Petitioner questioned Mr. Gianunzio extensively in open court, demanding to know the source of his purported knowledge that petitioner was prejudiced against him.

7. Petitioner denied the disqualification motion on the ground that it was not timely, since (a) he had been sitting in department 1 for more than two weeks preceding the date of the hearing; (b) it was commonly known that during the months of July, August and September many judges take vacations, and (c) department 1 and department 5 had been combined for the period of July 31—August 25, 1972, inclusive, with petitioner presiding.

8. Petitioner had himself sworn during the course of the proceedings and testified that he had no present recollection of the prior incident between himself and Mr. Gianunzio.

9. Ultimately petitioner disqualified himself and continued the matter conditioned, on

having demeaned a deputy district attorney in open court and having placed him under restraint, because the deputy had appealed petitioner's disposition of another case.[7] Count I also set forth proven specifications

the motion of the district attorney, upon Mr. Gianunzio's paying witness fees for all witnesses (approximately 10), including police witnesses, summoned by the district attorney for the preliminary examination.

10. Subsequently, on August 14, 1972, petitioner and Mr. Gianunzio reconciled their differences and petitioner reduced the amount to be paid as witness fees reciting that the fees would be paid by Mr. Gianunzio out of his own pocket and without any appeal from the order directing such witness fee payment.

11. Petitioner knew or should have known the proper method for handling a motion for disqualification. (Code Civ. Proc., § 170.6.) He acted out of revenge and in bad faith in testifying from the bench that he had no present recollection of the prior incident between himself and Mr. Gianunzio, and in questioning Mr. Gianunzio in open court as to the source of Mr. Gianunzio's statement that petitioner was hostile toward him.

[7]Our findings for count I-F are as follows:

1. On October 31, 1972, about 5:15 p.m., Deputy District Attorney Melville Behrendt appeared in petitioner's court for the purpose of asking petitioner to issue a search warrant. Deputy District Attorney Gerry Hubert, who was appearing for the People in a criminal matter, asked leave of court to bring up the search warrant. At this point Mr. Behrendt approached the bench with the search warrant and gave it to petitioner.

2. Prior to October 31, 1972, a notice of appeal had been filed by the district attorney from the decision of petitioner in the case of People v. Peluso. In support of the notice of appeal Mr. Behrendt had sworn to and filed his affidavit.

3. Upon Mr. Behrendt's approaching the bench, petitioner brought up the Peluso case, a matter not then pending before him and in no manner connected with the request to issue the search warrant. Petitioner proceeded to question Mr. Behrendt at length regarding the Peluso case affidavit.

4. Some 15 to 20 minutes later, after petitioner ordered production of Mr. Behrendt's affidavit and required him to read it, petitioner resumed his questioning. Mr. Behrendt was reluctant to answer any questions regarding the matter and the following colloquy ensued:

"MR. BEHRENDT: Your Honor, I recognize this affidavit as the affidavit that I signed on the 7th day of September, 1972 and I think that's all I should say at this time and I believe if the court has any jurisdiction at this time to ask me questions, that matter is not regularly scheduled at this time for a hearing in this department without notice to myself and I believe now the Appellant [sic] Department of the Superior Court will—

"THE COURT: Well, I don't believe it has gone up, Mr. Behrendt. That's why I am trying to find out what is going to be the status of this case. My understanding was that while it was filed there has to be some sort of a writ taken in order to get it up to the Appellate Court and all I am asking you, if the statement made by you, page two, lines 12 through 13—

"MR. BEHRENDT: I stated upon my affidavit that and that's all I should state at this time.

"THE COURT: Did you check the record? Did you check with the Department of Motor Vehicles? Did you ever check the record of the courts to see if the court in fact ordered what you said, contrary to what it had stated in open court?

"MR. BEHRENDT: May I ask what purpose these questions are being asked me at this time?

"THE COURT: I don't believe, Mr. Behrendt, that it is your position as an officer to ask the court any questions. The court is asking you and the court, I believe, is entitled to a little courtesy.

"MR. BEHRENDT: I have always been courteous to this court, Your Honor, and—

of petitioner's treatment of litigants in a cavalier, rude and improper manner. Thus, in count I-A, petitioner was alleged to have expressed his disbelief in the testimony of a defendant by having created a sound

"THE COURT: Now, the—

"MR. BEHRENDT:—and I have a right to reserve any answer to—

"THE COURT: Well, now, Mr. Behrendt, I'll tell you what. You have a seat in the jury box.

"MR. BEHRENDT: Am I being held, Your Honor, in custody at this time?

"THE COURT: If you wish it this way.

"MR. BEHRENDT: I ask the court to put me under arrest. I may ask for a writ in this so— I'm here in another matter before this court to ask this court to issue a search warrant and—

"THE COURT: Behrendt, you may be quiet, Mr. Behrendt. I'm not in a position to read that affidavit and in view of the fact that you are the person who prepared it, I want some time to read it carefully before I sign it. Now, you may have a seat. You may have a seat, Mr. Behrendt.

"MR. BEHRENDT: Is the court holding me in contempt or holding me in custody at this time?

"THE COURT: The court is telling you to sit down.

"MR. BEHRENDT: Your Honor, at this time I intend to leave the courtroom unless I am being placed under arrest for contempt.

"THE COURT: Mr. Behrendt, don't leave the courtroom. I'm telling you to sit down. Now, that is a court order, if you wish.

"MR. BEHRENDT: Is the court placing me in custody at this time, Your Honor?

"THE COURT: It depends on what you do, Mr. Behrendt. The court is telling you to sit down, Mr. Behrendt, I don't want to do anything rash. Now, you sit down.

"MR. BEHRENDT: May I ask the court what authority it is holding me in this court?

"THE COURT: Mr. Behrendt, that is a court order, to sit down until such time—

"MR. BEHRENDT: May the court define my status at this time, why I am being held inside this courtroom?

"THE COURT: Until such time as I have had a chance to read the affidavit for your search warrant and go over it with you—

"MR. BEHRENDT: May I withdraw that search warrant from this court?

"THE COURT: No, Mr. Behrendt, you may not.

"MR. BEHRENDT: May I ask the court's reason for that?

"THE COURT: Because the court was originally asked to sign it and the court will read it carefully.

"MR. BEHRENDT: Well, Your Honor, if I might state to the court at this time, may I make a statement to the court at this time?

"THE COURT: Mr. Behrendt, I have had enough of you, now, you sit down.

"MR. BEHRENDT: Your Honor, at this time—

"MR. COURT: Mr. Behrendt, this is the last time. Now, sit down.

"MR. BEHRENDT: Excuse me, Your Honor, I intend to leave the court. If I am no longer required—

"THE COURT: You are required here.

"MR. BEHRENDT: May I ask the reason the court is requiring me to stay in this courtroom?

"THE COURT: Do you want to escort him to a seat, please?

"MR. BEHRENDT: Am I being placed in custody at this time?

"THE COURT: Would you escort him to a seat, please? You may have a seat in the jury box."

5. Whereupon the bailiff took Mr. Behrendt by the arm and escorted him to the jury box.

commonly referred to as a "raspberry"[8] and in count I-B, petitioner was charged with having made a vulgar gesture (giving the "finger" or *digitus impudicus)* in reprimanding a defendant for coming in late in a traffic matter.[9]

Count II generally alleged that petitioner's judicial conduct was subject to the improper influence of his business relations and social friendships. In counts II-A and II-B, petitioner was charged with having approached a deputy district attorney, as well as that deputy's superior, in an attempt to influence the disposition of a case pending against a friend.[10] In count II-C, it was charged that petitioner had attempted to

6. The affidavit in support of the search warrant, though drafted by Mr. Behrendt, was signed by a police officer.

7. Ultimately, petitioner signed the search warrant after Mr. Behrendt had been kept in the jury box for approximately one-half hour, remarking that the search warrant was "slightly defective" in that night service had not been requested and petitioner was now so amending it. The subject matter of the search warrant was a vehicle then impounded and under police guard. Upon the signing of the warrant, petitioner suggested that in the future Mr. Behrendt should not return to petitioner's court.

8. It was petitioner's practice to order that persons placed in custody or under restraint, in open court, be seated in the jury box pending further action and only such persons in custody or under restraint, as a general rule, were so seated.

9. The affidavit filed pursuant to the appeal was in error and the deputy district attorney had, in fact, not checked the applicable records of the Department of Motor Vehicles.

10. Petitioner knew or should have known that it was beyond his judicial authority to bring up the Peluso case, to interrogate Mr. Behrendt regarding the Peluso matter, or to place Mr. Behrendt under restraint. Petitioner's attempt to put a gloss of good faith over the entire incident by stating that his careful scrutiny of the warrant had disclosed it to be "slightly defective" failed to conceal the fact that his conduct was clearly motivated by feelings of animosity toward Mr. Behrendt.

[8]Our findings for count I-A are as follows:

1. Sometime in the summer of 1972 petitioner presided at the trial in the case of People v. Fusilero in the Fremont Judicial District.

2. While the defendant Fusilero was on the witness stand, testifying in his own behalf, petitioner emitted a contemptuous sound commonly called a "raspberry" to indicate his disbelief of the witness. Such derisive sounds had been made by petitioner in open court on other occasions.

3. Petitioner's contemptuous "raspberry" was at least partially motivated by his anger towards the deputy public defender for having refused petitioner's settlement proposal, and was an attempt to prejudice the defendant's case.

[9]Our findings for count I-B are as follows:

1. In 1972 in open court petitioner did use a vulgar gesture (giving "the finger") in reprimanding a defendant for coming in late in a traffic matter.

2. The petitioner used the gesture to indicate that· the tardiness of the defendant demonstrated the latter's lack of respect for the court and not to demean the defendant nor to suggest the attitude of the court toward the defendant.

3. The evidence is not clear and convincing that petitioner used the gesture on any other occasion.

[10]Our findings for counts II-A and II-B are as follows:

1. On or about April 1972, there was a jury trial in the San Leandro-Hayward Judicial

coerce a deputy district attorney into accepting a negotiated plea and, upon his refusal to accept, petitioner had suppressed the evidence and had acquitted the defendant, who was the son of a friend and political supporter.[11] In count II-E, petitioner was charged with having caused a defendant cited for engaging in a speed contest (Veh. Code, § 23109, subd. (a)) to appear before him rather than in the department in which the defendant had been directed to appear. When the defendant, who was the nephew of a friend and political supporter, appeared before petitioner, the charge against the defendant was reduced to illegal parking (Veh. Code, § 22502) without notice to or an appearance by the

District before Judge Edgar, against one Alchian for an alleged violation of Vehicle Code section 23102. William Cosden, deputy district attorney, prosecuted, and Attorney Larry J. Frumes defended. The jury disagreed eleven to one for conviction. A mistrial was declared. Thereafter, the case was pending for resetting.

2. At all times material herein Mr. Alchian was a friend of petitioner. Mr. Frumes, a young attorney admitted to the bar in 1972, was dating petitioner's daughter and was associated with, or a law partner of, Robert Winkler, a close personal friend of petitioner for many years. (See finding No. 5, count V, fn. 15, *infra.*)

3. At no time material hereto was the case of People v. Alchian pending before petitioner, nor in the normal course of business would petitioner have presided over any jury retrial since he was not then assigned to criminal jury trials.

4. Subsequent to the mistrial in the Alchian case and while it was pending for resetting, petitioner, on a number of occasions, urged and sought to persuade Deputy District Attorney Cosden to reduce the charge against Mr. Alchian from Vehicle Code section 23102 (driving while under the influence of intoxicating beverage) to Vehicle Code section 23103 (reckless driving). On at least one occasion petitioner attempted similarly to persuade George Nicholson, then Mr. Cosden's superior in the district attorney's office.

5. Petitioner knew or should have known that he was using the prestige and authority of his judicial office to effect a disposition of a criminal case not before him in any judicial capacity and for reasons unconnected with the merits of the case.

[11]Our findings for count II-C are as follows:

1. On May 26, 1972, the case of People v. Christopher Stephen Goulardt charging the defendant with violations of Penal Code section 647, subdivision (f) (under influence of drugs in a public place) and Health and Safety Code section 11530 (possession of marijuana), was tried before petitioner sitting without a jury.

2. The defendant Goulardt's father, Kenneth J. Goulardt, was then administrative aide to the Mayor of Hayward, had known petitioner for about 10 years, and had been active in his campaign.

3. The defense counsel was Attorney Julio Juarez, a campaign supporter and long-time personal friend of petitioner. (See finding No. 3, count V, fn. 15, *infra.*)

4. During the course of the trial petitioner made a suggestion, which he had been informed prior to trial would be unacceptable, namely, that the district attorney's office permit the defendant to plead to the Penal Code section 647, subdivision (f) charge and dismiss the Health and Safety Code section 11530 charge.

5. Deputy District Attorney Robert B. Hutchins refused to accede, whereupon petitioner engaged in further questioning of police officers and then stated that the district attorney's refusal to accept the plea had placed him "in a box" and he would have to do something he did not wish to do.

6. Although the record is confused as to whether certain witnesses were sworn, whether a formal motion to suppress evidence was made, whether any order other than that

district attorney.[12] And finally, in count II-F it was alleged that petitioner had improperly transferred to his own court the file in a felony-assault

suppressing evidence under Penal Code section 1538.5 was made in open court, the minutes reveal that the defendant was found not guilty on both counts.

7. The Appellate Department of the Alameda County Superior Court reversed the trial court, and was itself reversed by the Court of Appeal, First District on the ground that the defendant having been once in jeopardy could not be retried despite what may have been "flagrant error" resulting in a "gross miscarriage of justice."

8. At the conclusion of the case petitioner stated that although the defendant was in fact guilty he had been saved by a technicality.

9. Petitioner purported to suppress all of the evidence against the defendant, not because he believed the defendant's arrest to have been invalid under the law as applied to the facts of the case, but rather because by resorting to the rubric of search and seizure law he could with colorable justification direct the acquittal of the defendant, notwithstanding what he knew or should have known, as an experienced criminal attorney, was ample evidence in the absence of any defense to find the defendant guilty of at least the Penal Code section 647, subdivision (f) charge. Petitioner's attempt to put a gloss of good faith on the whole incident, by declaring that the defendant "had been saved by a technicality," was intended to conceal the fact that petitioner's conduct was motivated by his relationship with the defendant's father and with the defendant's counsel, as well as petitioner's desire to punish the deputy district attorney for his refusal to accept petitioner's suggestion of a negotiated plea.

[12]Our findings for count II-E are as follows:

1. On or about July 6, 1972, Ralph N. Leines was arrested and taken into custody by an officer of the San Leandro Police Department for a violation of Vehicle Code section 23109, subdivision (a), (speed contest). Later, on the same day, Mr. Leines was released on a citation directing him to appear before Department 2 of the San Leandro-Hayward Municipal Court, sitting in San Leandro.

2. Sometime between July 6, 1972, and July 19, 1972, Mr. Leines gave his citation to Mr. James M. Temple, a bail bondsman, who said that he would see what he could do for Mr. Leines.

3. On or about July 19, 1972, Mr. Temple met petitioner in his chambers. No one other than petitioner and Mr. Temple were present. Mr. Temple showed Mr. Leines' citation to petitioner, who wrote on the face of the citation as follows:

"7-19-72
40 hours
at SLBC
by 9/30/72
all sessions ts
Reduce on
Completion to
22502 V.C. w*t*
    wds
To
7/28/72 Ex SENT"

4. This meant that Mr. Leines was to (a) donate 40 hours of work to the San Leandro Boys Club by September 30, 1972; (b) attend traffic school; and (c) upon completion of traffic school, the charge of Vehicle Code section 23109 would be reduced to Vehicle Code section 22502 (illegal parking) so that no abstract of conviction would be forwarded to the Department of Motor Vehicles.

5. Mr. Temple was advised by petitioner to notify Mr. Leines to appear on July 20, 1972, in department 5 before petitioner. Mr. Temple did so advise Mr. Leines, who appeared as requested but his case was not calendared nor called, so he left department 5 after the clerk gave him a date about one week later.

6. Unknown to petitioner, a criminal complaint had been filed against Mr. Leines by

case involving the same defendant as in count II-E, whereupon petitioner had ordered the defendant released on his own recognizance

the district attorney on July 11, 1972, on account of said violation of Vehicle Code section 23109. The criminal complaint was calendared before Judge Byers in department 2 in San Leandro, the department where Mr. Leines had been cited to appear. When Mr. Leines did not appear in department 2 on July 20, 1972, a bench warrant was issued for his arrest.

7. The following appears upon a form used by the San Leandro-Hayward Municipal Court to keep a record of the action taken in a case:

```
"CRT. DATE        ATTY          PROCEEDINGS
JUL 20 1972                      NA - BW - $750 bail    RKB
     JUL 20       pro-per        QUASH B/W-40 HRS S.L.B.C.         By 9/30/72
                                 6 sessions Traffic School         to 7/28/72
                                 Dismiss on completion       For Ex.Sent   WDS
                                 22502
7-28-72                          T.S.   assigned   Oct 28 1972
AUG 8 '72                        ENTERED ON MINUTES OF 8/3/72"
```

There is an obvious irregularity in the date "JUL 20" on the second line under "CRT. DATE" which consists of the letters "JUL" imprinted by a rubber stamp, but with the numerals "20" handwritten by a felt tip pen, possibly obliterating other numerals underneath.

8. The official criminal docket for the case shows the following:

| DATE | JUDGE | PROCEEDINGS |
|---|---|---|
| 7-11-72 | — | Complaint filed, sworn to by Larry Rinne, SLPD charging the defendant with having committed on or about July 6, 1972, the crimes of misdemeanors to wit: a violation of Section 23109a of the Vehicle Code, two counts thereof. Defendant was cited to appear on July 20, 1972 at 9:00 a.m. in Department 2. |
| 7-20-72 | Byers | DDA: W. Cosden. Defendant not appearing, bench warrant ordered with bail set at $750.00 |
| 8-3-72 | Spruance | Action on calendar for arraignment. (Minutes do not reflect whether defendant was present.) Action transferred from Department 2. Bench warrant is ordered quashed. Time is waived, jury waived, guilty plea entered. Defendant sentenced to 40 hours work for San Leandro Boys Club to be completed by 9-30-72. Defendant is ordered to attend 6 sessions of Traffic School, charge to be reduced to 22502 of the Vehicle Code upon completion." |

9. On or about July 28, 1972, Mr. Leines appeared before petitioner in department 5, entered his plea and was sentenced. At that time petitioner knew that the case was pending in department 2 and that Judge Byers had issued a bench warrant on account of Mr. Leines' failure to appear in department 2 on July 20, 1972. At said appearance of Mr. Leines, petitioner quashed the said bench warrant.

10. The Presiding Judge of the San Leandro-Hayward Municipal Court made no order, formal or informal, transferring the Leines case from department 2 to petitioner in department 5, nor was Judge Byers, presiding in department 2, consulted by petitioner regarding the case.

11. The district attorney's office had no knowledge or notice of petitioner's action in the case until on or about August 3, 1972.

12. On August 29, 1972, a notice of appeal was filed by the district attorney and

so as to prevent the defendant from being booked and interrogated by the police pursuant to the execution of an outstanding warrant for his arrest.[13]

ultimately the appellate department of the superior court set aside petitioner's judgment on the ground that it was void and remanded the case to the San Leandro-Hayward Municipal Court with directions that it be started over again with an arraignment of Mr. Leines.

13. Petitioner was friendly with James Temple's father and particularly with defendant Leines' uncle, Joseph Egan, who supported petitioner's election campaign. (See finding No. 3, count II-F, fn: 13, *infra*.)

14. Petitioner knew or should have known that he improperly assumed jurisdiction of the Leines case, in violation of rule 533(a), as then applicable, and that he acted in derogation of the rights of the People in proceeding without giving notice to the district attorney. It can only be concluded that petitioner's actions were motivated by nothing having to do with the merits of the case, but rather by his friendship with either Mr. Temple's father or Mr. Egan or both.

[13]Our findings for count II-F are as tollows:

1. On August 7, 1972, a felony assault complaint was filed in San Leandro by the district attorney against Ralph N. Leines, the same individual who appears in count II-E. A warrant for Mr. Leines' arrest was prepared but the issuance of the warrant was deferred to the following day.

2. On August 7, 1972, Mr. Leines called the police in San ·Leandro and was advised that there was a felony complaint on file against him and that the police wished to interview him at the police station. Mr. Leines called his parents for advice.

3. Mr. Leines' father met that day with his brother-in-law, Joseph Egan, business agent for the plasterers' union, who had known petitioner for some 12 years and had been active· in his campaign for election in 1970 to his present judicial position. Mr. Egan and Mr. Leines, senior, went to the court in Hayward to see petitioner about 5 p.m., August 7, 1972, and met petitioner in the parking lot outside the court building, just as petitioner was about to leave. A few minutes thereafter the clerk of the court entered the parking lot and was approached by petitioner and directed to bring the court file on the Leines assault matter from San Leandro to Hayward and to have the case placed on petitioner's calendar for the morning of August 8, 1972. Mr. Egan was directed by petitioner to have the defendant Leines in his court the following morning.

4. On the morning of August 8, 1972, the case of People v. Leines charging a violation of Penal Code section 245, was called and petitioner ordered the defendant released on his own recognizance. Although he had been informed the previous night that the San Leandro Police Department wished to interview and book the defendant, petitioner did not require at that time that the defendant be booked.

5. At the time petitioner released defendant on his own recognizance he stated that while he did not know the defendant (he had sentenced him on July 28, 1972, see count II-E, fn. 12, *supra*) he did know defendant's uncle, Mr. Egan, and that this was the first time that defendant had been involved in anything.

6. The case properly should have been in a department of the court in San Leandro and in the regular course of business would not have been in petitioner's department for any purpose.

7. Petitioner, in proceeding as he did, intended (a) to prevent the police from seeking to interrogate the defendant prior to the defendant's securing counsel, and (b) to avoid the booking of the defendant, as a favor to Joseph Egan, a friend and political supporter of petitioner.

8. On or about August 9, 1972, Deputy District Attorney George Nicholson telephoned petitioner with reference to releasing Mr. Leines without ordering him to be booked. Petitioner informed Mr. Nicholson that as an attorney he had avoided booking whenever possible and, as a judge, he was going to continue to do so; that he had done favors for

Count III consisted of a single specification alleging that petitioner had solicited another judge to dismiss a traffic citation which he had received and that petitioner had subsequently altered the reported disposition so as to convey the false impression that the citation had been dismissed upon petitioner's having completed traffic school.[14]

Finally petitioner was charged in the single specification of count V with having consistently appointed two attorneys in criminal cases in which the defendant was either not entitled to counsel at public expense or the public defender had not been requested to represent them.[15]

people in the past and he intended to continue to do so. When Deputy Nicholson suggested that his conduct was improper petitioner replied with an obscenity.

[14]Our findings for count III are as follows:

1. On or about November 2, 1971, petitioner personally received a traffic citation for allegedly running a red light. (Veh. Code, § 21453, subd. (a).) The citation directed petitioner to appear within 15 days.

2. On the same day that he received the citation petitioner went to the chambers of Judge Robert Fairwell, then presiding in department 1, and in the presence of at least one other person, Richard Jones, then a deputy district attorney, handed the citation to Judge Fairwell, who attempted to disqualify himself in the proceeding by writing "disqualified" on the back of the copy of the citation. Petitioner indicated displeasure with Judge Fairwell either verbally or by facial expression, whereupon Judge Fairwell crossed out the word "disqualified" and wrote on the back of the citation the following:

"11/2/71
Dismissed
   R.F."

3. Immediately thereafter petitioner, without the knowledge of Judge Fairwell, altered the above notation as follows:

"11/2/71
   all Sessions TS
Dismissed on completion
   R.F."

In fact, petitioner did not attend traffic school pursuant to his own notation on the citation.

4. The San Leandro-Hayward Municipal Court judges have authorized the clerks of the court to send defendants with first offenses to traffic school without any appearance before a judge.

5. We can only conclude that petitioner knowingly circumvented proper legal procedure and placed Judge Fairwell in an embarrassing predicament for the purpose of having his citation dismissed. The only reasonable inference from petitioner's alteration of Judge Fairwell's outright dismissal of the citation was that petitioner intended to convey the erroneous impression that the citation had been dismissed after petitioner had attended traffic school in accordance with the usual practice in the San Leandro-Hayward Municipal Court, thus concealing the fact that he had received preferential treatment.

[15]Our findings for count V are as follows:

1. In the period July 1971 to July 1972 petitioner appointed two attorneys, Julio Juarez and Robert Winkler, to represent criminal defendants in cases pending in the San Leandro-Hayward Municipal Court. Mr. Juarez was appointed in 18 cases; Mr. Winkler in 9 cases. These 27 appointments constituted somewhat more than 44 percent of all appointments made by petitioner in that same period. The balance of petitioner's 61

Taken as a whole the record indicates that petitioner engaged in a pervasive course of conduct of overreaching his judicial authority by deciding cases for reasons other than the merits, by improperly influencing another judge, and by using the judicial process to gain special favors for friends and political supporters. The record also shows that petitioner has under color of judicial office repeatedly committed petty, vindictive, vulgar and otherwise unjudicial acts.

We turn now to the question whether the conduct which we have found as a fact to have occurred is conduct for which discipline may constitutionally be imposed. Other than for habitual intemperance or wilful and persistent failure to perform his duties, the Constitution provides that a judge may be censured or removed from the bench only for wilful misconduct or prejudicial conduct. (See fn. 1, *supra*.) We first sought to give meaning to these standards of conduct in *Geiler*. ■ We explained that the more serious charge, "wilful misconduct," is reserved for unjudicial conduct committed in bad faith by a judge acting in his judicial capacity. (10 Cal.3d at pp. 283-284.) The term "bad faith" implies that the judge "intentionally committed acts which he knew or should have known were beyond his lawful power." (10

appointments, constituting approximately 56 percent of his total appointments, were received by 22 other attorneys, no one of whom received more than 3 appointments, or approximately 5 percent of the total appointments. Petitioner maintained no list of attorneys available for appointment in appropriate criminal cases.

2. At all times material hereto, there was an Alameda County Public Defender's office duly constituted and able to afford legal representation to indigent defendants. In the 27 appointments that were made to Mr. Juarez and Mr. Winkler, no valid reason, such as conflict of interest, existed to justify such appointments, nor does it appear that in each of the 27 cases a determination of the indigency of these defendants had been duly made as required by Government Code section 27707. Mr. Juarez and Mr. Winkler were compensated by Alameda County public funds in amounts not less than $150 for each court appearance without regard to the nature of the service performed or the time expended pursuant to orders for payment of attorney's fees.

3. Mr. Juarez has been a friend of petitioner since 1951. At one time prior to petitioner's election to the municipal court, Mr. Juarez rented office space from the law firm of which petitioner was then a partner. Mr. Juarez presently rents office space from Mr. Winkler, whom he has known for some 10 years. Because of his long friendship with petitioner Mr. Juarez was very active in petitioner's campaign for election in 1970.

4. Mr. Juarez has been an attorney since 1966, practicing in the San Leandro-Hayward area. Between 1966 and the time petitioner took office in January 1971, Mr. Juarez had received approximately 8 to 10 appointments from all courts to represent criminal defendants.

5. Mr. Winkler has known petitioner for the past 25 years. They have been close personal friends since they were in law school together. Mr. Winkler was active in petitioner's campaign for election in 1970.

6. Petitioner knew or should have known the proper procedures required in appointing private counsel for indigent defendants. We can only conclude that petitioner's appointments of Messrs. Juarez and Winkler were motivated by his desire to reward his friends and election campaign supporters.

Cal.3d at p. 286.) As so used, "bad faith" entails actual malice as the motivation for a judge's acting ultra vires. The requisite intent must exceed mere volition; negligence alone, if not so gross as to call its genuineness into question, falls short of "bad faith." "Bad faith" also encompasses acts within the lawful power of a judge which nevertheless are committed for a corrupt purpose, i.e., for any purpose other than the faithful discharge of judicial duties. In sum, "bad faith" is quintessentially a concept of specific intent, requiring consciousness of purpose as an antecedent to a judge's acting maliciously or corruptly.

■ The "lesser included offense" of "prejudicial conduct" lacks the element of either "bad faith" or action in a judicial capacity.[16] "Prejudicial conduct" includes "conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office" (*Geiler, supra,* 10 Cal.3d at p. 284), as well as "wilful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity." (10 Cal.3d at p. 284, fn. 11.) We stressed in *Geiler* the importance of an objective rather than a subjective appraisal of judicial conduct in light of the constitutional standards for judicial discipline, and pursuant thereto we noted that the canons of the American Bar Association's Code of Judicial Conduct might usefully be consulted to give meaning to the constitutional standards.[17]

■ We examine first the proven specifications of count I. At the outset we refer to the third canon of the California Code of Judicial Conduct (see fn. 17, *supra*), which provides in pertinent part that "[a]

[16]The masters found six specifications of misconduct to constitute both wilful misconduct and prejudicial conduct. Because "prejudicial conduct" is a "lesser included offense" of "wilful misconduct" the masters' additional findings that each of the six charges constituted prejudicial conduct were superfluous.

[17]In *Geiler* we said: "The first two canons of the Code of Judicial Conduct proposed in 1972 by the American Bar Association's Special Committee on Standards of Judicial Conduct emphasize the importance of appraising alleged judicial misconduct objectively rather than subjectively. Canon One declares: 'a judge should uphold the integrity and independence of the judiciary.' The accompanying text adds: 'A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.' Canon Two speaks for itself: 'A judge should avoid impropriety and *the appearance of impropriety* in *all* his activities.' (Italics added.)" (10 Cal.3d at pp. 281-282.)

The American Bar Association's Code of Judicial Conduct was adopted by the House of Delegates on August 16, 1972. Subsequently, the Conference of California Judges adopted, with some modifications not relevant here, the American Bar Association Code of Judicial Conduct of 1972, effective January 1, 1975. (See Cal. Rules of Court, Appendix, div. II, *Cal. Code of Jud. Conduct.*)

judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control." (Canon 3A(3).)

Except for petitioner's vulgar "finger" gesture (count I-B; see fn. 9, *supra*) the proven specifications of count I show that petitioner engaged in a pervasive course of conduct of acting vindictively toward recalcitrant attorneys. With regard to petitioner's conduct toward Mr. Gianunzio (count I-E; see fn. 6, *supra*), it goes without saying that as a judge, petitioner should have known the proper method for handling a motion for disqualification. (Code Civ. Proc., § 170.6.) We have previously noted in connection with similar misconduct that "the rule has developed that, once an affidavit of prejudice has been filed under section 170.6, the court has no jurisdiction to hold further proceedings in the matter except to inquire into the timeliness of the affidavit or its technical sufficiency under the statute. . . . When the affidavit is timely and properly made, immediate disqualification is mandatory. . . . As this court has noted in respect to the exercise of contempt powers, '[a] judge should bear in mind that he is engaged, not so much in vindicating his own character, as in promoting the respect due to the administration of the laws. . . .' " (*McCartney* v. *Commission on Judicial Qualifications,* (1974) 12 Cal.3d 512, 531-532 [116 Cal.Rptr. 260, 526 P.2d 268].) Clearly, petitioner abused his judicial authority and acted out of revenge and hostility. Petitioner's treatment of Mr. Behrendt regarding the Peluso case (count I-F; see fn. 7, *supra*) was also an abuse of judicial authority and clearly motivated by feelings of animosity. Similarly, petitioner's contemptuous "raspberry" (count I-A; see fn. 8, *supra*) was a deliberate and malicious attempt to prejudice the defendant's case, motivated by petitioner's anger toward the deputy public defender. Because petitioner acted in bad faith in exceeding the bounds of his lawful power, we find each of these incidents to have been wilful misconduct.

■ We find petitioner's vulgar "finger" gesture (count I-B; see fn. 9, *supra*), which resulted in a loss of courtroom dignity, to have been prejudicial conduct. Because it was an isolated act directed towards edifying the defendant rather than prejudicing his case, it was not done in bad faith and hence cannot be deemed to have been wilful misconduct.

■ We examine next the proven specifications of count II, referring again to one of the canons of the California Code of Judicial Conduct:

"A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. . . ." (Cal. Code of Jud. Conduct, *supra,* Canon 2B.) The proven specifications of count II show a flagrant disregard for this canon. In each of the incidents, petitioner intentionally used the prestige or authority of his judicial office to effect or influence the disposition of a criminal case for a personal reason unconnected with the merits of the case, to wit, petitioner's desire to help friends and political supporters. Petitioner was thus acting in bad faith in attempting to influence the disposition of the Alchian case (counts II-A and II-B; see fn. 10, *supra*) which was not before him in any judicial capacity; in dismissing the Goulardt case (count II-C; see fn. 11, *supra*); in improperly assuming jurisdiction and acting without notice to the district attorney in the Leines traffic case (count II-E; see fn. 12, *supra*); as well as in improperly assuming jurisdiction and releasing Leines on his own recognizance in the assault case (count II-F; see fn. 13, *supra*). As to the Goulardt case, there are additional grounds for the conclusion that petitioner acted in bad faith. In another instance of the course of conduct involved in count I, petitioner's handling of the Goulardt case was motivated not only by political favoritism but also by a desire to punish the deputy district attorney for his refusal to accept petitioner's suggestion of a negotiated plea. We have no recourse but to conclude that each of the proven specifications of count II constituted wilful misconduct, save only with respect to our finding concerning petitioner's use of an obscenity when talking on the telephone with a deputy district attorney (finding No. 8, count II-F; see fn. 13, *supra*). For the reasons expressed above regarding the "finger" gesture (count I-B; see fn. 9, *supra*), we conclude that petitioner's injudicious comment constituted prejudicial conduct. In *McCartney* we established that the muttering of profanity need not necessarily be deemed serious enough to warrant removal or censure. It should be noted, however, that the conduct there in issue, although unbecoming and injudicious, was not intended to be heard and was "not directed as a reprimand to court personnel, attorneys or any other specific individuals." (*McCartney* v. *Commission on Judicial Qualifications, supra,* 12 Cal.3d at p. 535.)

■ We also find petitioner's conduct regarding his own traffic citation (count III; see fn. 14, *supra*) to have been wilful misconduct. Inasmuch as the judicial district's practices allowed petitioner to be assigned automatically and ministerially to traffic school, we can only

conclude that petitioner acted in bad faith in circumventing proper legal procedure to have his citation dismissed as well as in thereafter concealing the fact that he had received preferential treatment.

■ Finally, we consider petitioner's illegal and unjustified appointments of two attorneys in criminal cases (count V; see fn. 15, *supra*). Once more we refer to the standards of conduct established by the California Code of Judicial Conduct: "A judge should not make unnecessary appointments. He should exercise his power of appointment only on the basis of merit, avoiding nepotism and favoritism. He should not approve compensation of appointees beyond the fair value of services rendered." (Cal. Code of Jud. Conduct, *supra*, (Canon 3B(4)).) California law provides that the court makes the final determination as to whether the defendant is financially qualified for representation at county expense. (Gov. Code, § 27707.) In counties where there is a public defender's office the court normally appoints the public defender to represent the indigent defendant. "Where there is no public defender, or the court finds that because of a conflict of interest or other reasons the public defender has properly refused to represent the indigent, the court shall appoint private counsel, in which case the court shall fix a reasonable fee and order that the fee, together with necessary expenses, be paid by the county." (Misdemeanor Procedure Bench Book, California College of Trial Judges (1971) § 1.39 (including a sample form for defendant's "declaration of financial inability to employ counsel"); see also California Municipal Justice Courts Manual, California Center for Judicial Education Research (1974) § 11.43 (also including the same sample form).) We find that petitioner acted in bad faith in exceeding the bounds of his lawful powers for the purpose of benefiting his friends and political supporters. His appointments clearly conflicted with the standards established by the California Code of Judicial Conduct. Therefore, we find petitioner's conduct to have been wilful misconduct.

■ We come now to our most important responsibility,[18] the decision of the ultimate question whether a judge, whose conduct has

---

[18]Under the controlling principles of *Geiler*, it is our findings of fact and conclusions of law upon which we make our determination of the ultimate action to be taken. (*Geiler* v. *Commission on Judicial Qualifications, supra*, 10 Cal.3d at p. 276.) Although we give great weight to the masters' findings of fact (*id.*, at pp. 275-276), the conclusions of law and the ultimate sanction are solely within our province and domain; we do not defer to either the masters or the Commission in deciding these matters. Language to the contrary in *McCartney* v. *Commission on Judicial Qualifications, supra*, 12 Cal.3d at page 540 is no longer to be regarded as controlling.

been found to be either wilful misconduct or prejudicial conduct,[19] should be censured or removed from the bench. (See fn. 1, *supra.*)

■ Petitioner has presented a good deal of evidence that he worked hard in an overworked court, that he was conscientious in admonishing defendants of their rights, that he gave special attention to Spanish-speaking defendants, that he assumed judicial office in a court where "loose practices" prevailed and no rules existed, and that the lack of communication between the various judges of his court compounded the problems created by the considerable geographical distance between them. Petitioner offers this evidence to mitigate the adverse inferences from the procedural irregularities underlying his conduct. Petitioner concedes some of these irregularities but what he emphatically does not concede is the bad faith which we have found to pervade the proven specifications. Petitioner does not contend nor can we conceive that there are circumstances in which bad faith itself can be excused by extraneous circumstances. There can be no mitigation for maliciously motivated unjudicial conduct. Since we have found petitioner to have acted in bad faith on numerous occasions, we obviously have given no credit to petitioner's asseverations of mitigating circumstances.

Petitioner first argues that he was the victim of the judicial district's "loose practices." We grant that loose practices prevailed, but petitioner was accused of more than merely following irregular procedures. His appointments of attorneys without first ascertaining the indigency of the defendant or whether the public defender's office refused representation because of a conflict of interest cannot justify his favoritism toward Messrs. Juarez and Winkler. Similarly, even though "loose practices" permitted reductions of certain Vehicle Code violations to parking violations, the transferring of cases from one court to another, and the granting of a release to a defendant not otherwise before the judge, special favors for friends and political supporters were not sanctioned by any such "loose practices."

Petitioner also argues that he was inexperienced and that he had no idea that he was acting improperly because "no one complained." Although petitioner was "green" as a judge, he had 20 years of

---

[19]As we noted in *Geiler,* "[i]t should be emphasized that our characterization of one ground for imposing discipline as more or less serious than the other does not imply that in a given case we would regard the ultimate sanction of removal as unjustified solely for 'conduct prejudicial to the administration of justice which brings the judicial office into disrepute.' " (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 284, fn. 11.)

experience as a criminal attorney, practicing in many courts. Furthermore, he had many reference works at his disposal to answer most questions as to proper courtroom procedure. (E.g., Misdemeanor Procedure Bench Book, *supra.* See also the recently prepared Cal. Municipal Justice Courts Manual, *supra.*) Finally, the evidence is clear and convincing that when attorneys did object, petitioner retaliated. Thus, his vengefulness went beyond mere ignorance of proper procedures. In the Fusilero case, the deputy public defender's objection resulted in his client getting petitioner's "raspberry." Petitioner was "provoked" by Deputy District Attorney Behrendt's erroneous affidavit filed for an appeal taken in another matter and put him in the jury box, notwithstanding the deputy objected and wanted his status clarified. We can accept the earlier error as justification for petitioner's "close scrutiny" of the search warrant application, even though the deputy district attorney merely participated in the preparation of the warrant and was not the affiant, but not as justification for restraining the deputy unlawfully. In the Goulardt matter, when Deputy District Attorney Hutchins objected, petitioner claimed he was being placed "in a box" and would have to do something he did not wish to do. And, in the Leines felony-assault matter, to Deputy District Attorney Nicholson's objection, petitioner responded with an obscenity.

Petitioner finally argues that his heavy workload justified much of his conduct. We agree with the Commission that "petitioner's intent and motivation for committing these acts goes beyond the fact that he knew or should have known that he was acting beyond his lawful power. Here, the evidence clearly shows the reasons, and these reasons belie any excuse that petitioner proceeded improperly merely because he was overworked or inexperienced in proper procedures." Thus petitioner's claims that calendar pressures and language problems necessitated the appointment of private counsel do not conceal the fact that he was motivated by the desire to reward his friends and political supporters.

To be sure, if petitioner's giving the "finger" to a defendant and his use of an obscenity during a telephone conversation with a deputy district attorney were the only charges brought against him, censure would be the appropriate discipline, since we find little risk of the recurrence of such conduct. We are persuaded to accept petitioner's explanation that in both incidents he was provoked, but that in any event, he realized how inappropriate his actions were and would not permit their recurrence.

In light of the remaining specifications of misconduct, however, we conclude that the Commission's recommendation of removal should be adopted. We find that petitioner's motives were far worse than those in issue in *McCartney*,[20] where we were persuaded that mitigating factors successfully rebutted any inference of bad faith. We would be remiss in our duty if we allowed petitioner's claims of justification to mitigate against removal, in view of the clear evidence of petitioner's petty tyranny and favoritism, which has led to our determination that petitioner has acted in bad faith. Mere censure of petitioner would woefully fail to convey our utter reproval of any judge who allows malice or other improper personal motivations to infect the administration of justice.

We are ever mindful of the important role the municipal court judge fulfills in our system of justice. He handles more cases than any other judge in any other court and the municipal court is the only court that the average citizen is likely to observe or participate in. Furthermore, the municipal court judge has broad powers in the performance of his duties: he reviews the sufficiency of warrants and the validity of their execution; he presides over hearings which determine whether certain offenders will be bound over for trial in the superior court; he sets bail, appoints counsel and can even release defendants on their own recognizance; and finally, absent a clear showing of abuse, many of his rulings, decisions and findings are final. In fact, in misdemeanor cases, his authority is almost supreme, since he often acts as both judge and jury and rarely are his decisions appealed. Consequently, we must be careful that the municipal court judges of this state are fully capable of assuming the responsibilities inherent in such an important job.

Because it is our duty to preserve the integrity and independence of the judiciary (Cal. Code Jud. Conduct, *supra,* Canon 1) and because we cannot tolerate the risk of recurrence of petitioner's conduct, we order Judge William D. Spruance of the Municipal Court of the San Leandro-Hayward Judicial District removed from office. This order is final forthwith.

However, we feel that justice will best be served by allowing petitioner

[20] In *McCartney* we were concerned merely with "modes of proper judicial behavior necessarily learned only by judicial experience." (*McCartney* v. *Commission on Judicial Qualifications, supra,* 12 Cal.3d at p. 539.) Here, we are concerned with the basic respect for our institutions of justice which should be a fundamental concern of every judge and attorney.

to resume the practice of law.[21] We note that his long career as a lawyer was unblemished and that, as a practicing attorney, he will not have available that authority which he abused as a judge. We therefore further order that despite his removal from judicial office, William D. Spruance shall, if otherwise qualified, be permitted to practice law in the State of California. (See Cal. Const., art. VI, § 18, subd. (d).)

---

[21]Judge Geiler was also permitted to practice law despite his removal from the bench. We noted that his unjudicial conduct did not amount to moral turpitude, dishonesty or corruption (cf. Bus. & Prof. Code, § 6106), but that his removal was required "more by the high standards of judicial office than by his personal failings." (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 287.) We wish to point out that the misconduct here involved is more serious with regard to petitioner's qualifications to practice law. By allowing petitioner to resume the practice of law we do not mean to intimate that petitioner's pattern of conduct of bringing improper influences to bear upon the judicial office is more proper for an attorney than a judge. Were the conduct here involved committed by an attorney, although we do not perceive that the attorney would be subject to so severe a sanction as disbarment, he would certainly be subject to public reproval or other appropriate discipline.