IN RE: INQUIRY CONCERNING A JUDGE, NO. 146 C. PRESTON CORNELIUS, RESPONDENT

No. 414A92

(Filed 3 December 1993)

**Judges, Justices, and Magistrates § 36 (NCI4th) — censure of superior court judge — conduct prejudicial to administration of justice**

A superior court judge is censured for conduct prejudicial to the administration of justice that brings the judicial office into disrepute for violations of Canons 2A and 2B of the N.C. Code of Judicial Conduct based upon findings supported by uncontroverted evidence that the judge gave legal advice and counsel to an individual with regard to her discharge from employment with the Iredell County DSS, undertook in his official capacity to intervene on her behalf, and conveyed and permitted others to convey the impression that the discharged individual had special influence with him. However, the judge's conduct did not rise to the level of willful misconduct in office.

**Am Jur 2d, Judges § 19.**

Petition by respondent for hearing on the recommendation filed by the Judicial Standards Commission with the Clerk of the Supreme Court of North Carolina on 16 December 1992. Heard in the Supreme Court 12 May 1993.

**IN RE CORNELIUS**

[335 N.C. 198 (1993)]

*Judicial Standards Commission, by William N. Farrell, Jr., Senior Deputy Attorney General, for petitioner-appellee.*

*Brinkley, Walser, McGirt, Miller, Smith & Coles, by Walter F. Brinkley, for respondent-appellant.*

PER CURIAM.

This matter is before the Court upon the recommendation of the Judicial Standards Commission that respondent, C. Preston Cornelius, a Judge of the General Court of Justice, Superior Court Division, Twenty-Second Judicial District, be censured as provided in N.C.G.S. § 7A-376. The record filed with us in support of the recommendation of the Judicial Standards Commission (Commission) that Judge Cornelius (respondent) be censured reveals the following:

On 19 October 1990, Judge Cornelius was advised pursuant to Rule 7 of the Judicial Standards Proceedings that the Judicial Standards Commission had ordered a preliminary investigation concerning alleged misconduct by Judge Cornelius.

On 3 March 1992, special counsel to the Judicial Standards Commission filed with the Commission a complaint which alleged that the respondent threatened to convene a grand jury if a discharged employee of the Iredell County Department of Social Services was not reinstated or given a hearing on her discharge and did convene the grand jury when she was not reinstated or given a hearing. The complaint alleged that the actions of the respondent constituted willful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute and constituted violations of the North Carolina Code of Judicial Conduct.

Notice of the complaint was served on respondent on 10 March 1992, and respondent filed an answer on 26 April 1992, denying the charges contained in the complaint.

An evidentiary hearing was held before the Commission on 7 and 8 October 1992, in Raleigh. On 24 November 1992, the Commission entered its recommendation containing findings of fact and conclusions of law and recommending that respondent be censured by the Supreme Court of North Carolina. More specifically, the Commission found that there was clear and convincing evidence to support the allegation that the respondent threatened to convene

a grand jury if a discharged employee of the Iredell County Department of Social Services was not reinstated or given a hearing on her discharge and did convene the grand jury when she was not reinstated or given a hearing. The Commission found that such conduct by the respondent violated Canons 2A and 2B of the North Carolina Code of Judicial Conduct[1] and amounted to willful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

The Commission's formal "Recommendation" and the record of the proceedings was filed with the Clerk of this Court on 7 December 1992. On 9 December 1992, the Clerk notified respondent that the Judicial Standards Commission's Recommendation had been filed with the Court. On 17 December 1992, respondent, pursuant to Rule 2(b) of the Rules Governing Supreme Court Review of Recommendations of the Judicial Standards Commission, filed a petition with the Court for a hearing upon the Recommendation of the Commission. The matter was heard in this Court on 12 May 1993.

The Commission found the pertinent facts as follows:

9. On July 3, 1990, Iredell County Department of Social Services (DSS) Director Donald C. Wall met with Rebecca L. Shell along with DSS program administrator Mary Deaton and Lisa York, Ms. Shell's supervisor. During this meeting, Mr. Wall informed Ms. Shell that based on his review of her evaluation as a probationary employee, he was terminating her employment effective July 5, 1990, and he gave her specific reasons for his decision.

10. Over the course of the next several days, Ms. Shell contacted numerous people, including the respondent, in order to protest her termination and to seek assistance in regaining her job. The respondent personally met with Ms. Shell and

---

1. Canon 2A of the North Carolina Code of Judicial Conduct provides: "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2B provides: "A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence. He should not testify voluntarily as a character witness."

discussed her situation. In the course of their discussion, the respondent advised Ms. Shell to seek legal counsel concerning her employment termination and offered to look into her assertion that Mr. Wall had unfairly terminated her employment because of her dispute with a local housing authority over housing for the Bines family.

11. Soon thereafter, the respondent again met with Ms. Shell; in fact, there were several conferences or discussions between the respondent and Ms. Shell in the period of early July, 1990, to early August, 1990. In the interim between the respondent and Ms. Shell's first meeting and this subsequent meeting, the respondent had decided Ms. Shell was entitled to a hearing, and he tried to find some means or method by which she could establish a record of her contentions regarding the reasons for her termination since the respondent believed such a record would be important for purposes of any future legal action by Ms. Shell. At this subsequent meeting, the respondent and Ms. Shell discussed the possibilities for establishing a record of her grievance against DSS, and one of those possibilities discussed was his convening a grand jury before which she could appear and testify.

12. Thereafter, the respondent received a telephone call on July 11, 1990, from Iredell County Commissioner and DSS Board Chairperson Alice M. Stewart whom Ms. Shell also had contacted by telephone several times concerning her termination. During this conversation, Ms. Stewart, who previously had not had any disagreements with the respondent, told the respondent that Ms. Shell had represented to her that: 1) the respondent was a personal friend of Ms. Shell's, 2) he was advising Ms. Shell, and 3) he felt Ms. Shell was entitled to a hearing before the DSS board. Ms. Stewart also told the respondent that she wanted to determine his interest in Ms. Shell's situation in light of Ms. Shell's representations to her.

13. At this point the respondent interrupted by asserting his beliefs that Ms. Shell had not been treated fairly by DSS and she was entitled to a hearing and by stating that he had advised Ms. Shell to seek a hearing before the DSS Board. When Ms. Stewart responded that there was no provision for a hearing for probationary employees such as Ms. Shell, the respondent referred to having received numerous complaints

IN RE CORNELIUS

[335 N.C. 198 (1993)]

about DSS, none of which he specified and none of which he had ever brought to Ms. Stewart's attention.

14. The respondent then related his consideration of convening the grand jury to investigate these complaints and told Ms. Stewart she could use her influence to see that Ms. Shell received a hearing, stating that Ms. Stewart could make it easy or hard. Ms. Stewart's unequivocal reply to the respondent was that she had no intention of using any influence she might have to obtain a hearing before the DSS Board for Ms. Shell. Having concluded the conversation, Ms. Stewart clearly believed that in order to avoid a grand jury investigation of DSS, she would have to give Ms. Shell a hearing.

15. Subsequent to his telephone conversation with Ms. Stewart, the respondent arranged a meeting with Mr. Wall, and a meeting was scheduled and held around noon on July 13, 1990. Although Mr. Wall had never received any communication from the respondent regarding complaints against DSS prior to this time, he asked DSS attorney William H. McMillan to attend this meeting since Mr. Wall had not been informed of the meeting's subject matter. Mr. McMillan agreed to attend and was in fact present during the July 13, 1990, meeting between the respondent and Mr. Wall.

16. The respondent began the meeting on July 13, 1990, with Mr. Wall and Mr. McMillan by saying he had received numerous complaints about DSS which needed correction and indicated Mr. Wall apparently was not doing a good job. When Mr. Wall asked the respondent to specify the complaints against DSS, the respondent did refer to the Sarno case as an example, but he did not present any documentation concerning that or any other complaint against DSS despite his policy that such alleged complaints were to be reduced to writing and signed by the complainant.

17. The respondent continued and said he was considering convening the grand jury to investigate DSS. At this point the respondent specifically referred to Ms. Shell and her termination. The respondent related that after talking with her, he felt she should be reinstated, and he threatened to convene the grand jury if she was not reinstated, saying to Mr. Wall, "Say you are not going to reinstate Mrs. Shell and I'll call a hearing—a grand jury hearing." When Mr. Wall replied that

he would not reinstate Ms. Shell, the respondent said, "Okay, I'll call for a hearing."

18. The respondent persisted and wanted to know the reasons for Ms. Shell's termination even though Mr. Wall advised the respondent that she had been informed of the reasons. In light of the respondent's persistence, Mr. Wall commented that he had never encountered such judicial and political pressure, and the respondent's reply was to characterize the pressure as legal pressure.

19. Seeking to intervene in the situation, Mr. McMillan interjected with the suggestion that even though a termination hearing was not required for a probationary employee (an opinion which Mr. Wall had also expressed), he would do some research to see if Ms. Shell could have a hearing. The respondent reacted favorably to this proposal and indicated such a hearing would be a satisfactory solution and would prevent a grand jury from being convened. The respondent concluded the meeting by telling Mr. McMillan to call him on Monday, July 16, 1990, with the results of his research regarding the possibility of a hearing for Ms. Shell.

20. Later in the day on July 13, 1990, Mr. McMillan communicated a recommendation to Mr. Wall for the DSS Board to grant Ms. Shell a hearing in order to obviate having a grand jury convened to conduct an investigation into DSS. However, when Mr. McMillan's recommendation was proposed to Ms. Stewart by Mr. Wall, she rejected it, and Mr. McMillan subsequently informed the respondent of Ms. Stewart's rejection on July 16, 1990.

21. Thereafter and as a direct consequence of DSS' refusal to reinstate or grant a hearing to Ms. Shell, the respondent sent letters dated August 1, 1990, to Ms. Stewart, Mr. Wall, Ms. Deaton, and Ms. York who were the four (4) individuals who had participated in the decision to terminate Ms. Shell's employment with DSS or the decisions not to reinstate or give a hearing to Ms. Shell. These letters informed the recipients that the grand jury would begin an investigation of allegations against DSS. The letters to Mr. Wall and Ms. Stewart also contained misstatements as to: 1) the existence of pending lawsuits against them, 2) the existence of a preliminary opinion of the Attorney General's office that Ms. Stewart's service

IN RE CORNELIUS

[335 N.C. 198 (1993)]

as a county commissioner and DSS Board chairperson constituted a conflict of interest, and 3) the advice of Mr. McMillan concerning the necessity of a termination hearing for an employee.

22. The respondent also: 1) had his secretary provide to the media announcements of a grand jury investigation which gave his office telephone number as a contact for persons with grievances who wished to make an appointment for an appearance before the grand jury, 2) had his secretary summon the grand jurors for the week of August 6, 1990, when he was commissioned to hold court, and 3) arranged for a court reporter to be present during the grand jury proceedings so there would be a record of the testimony of each witness, a record of Ms. Shell's contentions regarding the reasons for her termination, and a record for purposes of any future legal action by Ms. Shell.

23. Finally, the respondent did in fact formally convene an Iredell County Investigative Grand Jury on August 7, 1990, without providing any written documentation of any complaints against DSS, but rather by instructing the grand jury members that this was a special grand jury investigation of allegations against DSS concerning which the grand jury was to make findings of fact and recommendations after listening to the testimony of the witnesses who appeared before them, the first of whom was Ms. Shell.

24. This Iredell County Investigative Grand Jury was in session from August 7, 1990, through August 9, 1990, and during this session, it received sworn testimony from witnesses and made recommendations calling for the reinstatement of Ms. Shell and the immediate resignation, termination, or reprimand of a number of DSS personnel.

Respondent asks this Court not to adopt the recommendation of the Commission. He contends: (1) the allegations in the complaint are not sufficient to support the charge against him, (2) the ultimate facts required to support the findings and conclusions of the Commission are not supported by clear and convincing evidence, and (3) the evidence is not sufficient to support a finding that any misconduct on the part of the respondent was willful. Special counsel to the Commission argues that this Court should accept the findings and recommendation of the Commission because the Commission

**IN RE CORNELIUS**

[335 N.C. 198 (1993)]

properly found the facts by clear and convincing evidence and made appropriate conclusions on clear and convincing evidence that the actions of respondent constitute conduct which violates the North Carolina Code of Judicial Conduct, constitute willful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute and warrant the Commission's recommendation of censure. We consider respondent's contentions seriatim.

Respondent contends *inter alia* that the allegations in the complaint are not sufficient to support the charges against him because he had the authority to convene the grand jury to conduct a noncriminal investigation of the Iredell County Department of Social Services. Respondent reasons that he cannot be guilty of misconduct in threatening to convene the grand jury, for whatever purpose, because he had the lawful authority to do so. Special counsel, on the other hand, contends that respondent did not have the authority to convene a grand jury to make an investigation in this case and that the convening of the grand jury by respondent was improper for that reason. As our decision to follow the Commission's recommendation of censure rests upon another ground revealed in the findings and recommendation of the Commission, however, it is unnecessary for us to address these contentions by the respondent and counsel for the Commission.

Respondent's second contention is that the findings and conclusions of the Commission regarding respondent's course of conduct are not supported by clear and convincing evidence.

A proceeding before the Judicial Standards Commission is "an inquiry into the conduct of one exercising judicial power . . . . Its aim is not to punish the individual but to maintain the honor and dignity of the judiciary and the proper administration of justice." *In Re Nowell*, 293 N.C. 235, 241, 237 S.E.2d 246, 250 (1977). The recommendations of the Commission are not binding upon the Supreme Court, and this Court must consider all the evidence and exercise its independent judgment as to whether it should censure the respondent, remove him from office, or decline to do either. *In re Martin*, 295 N.C. 291, 301, 245 S.E.2d 766, 772 (1978).

*In re Bullock*, 328 N.C. 712, 717, 403 S.E.2d 264, 266 (1991). The quantum of proof in proceedings before the Commission, by clear and convincing evidence, is a burden greater than that of proof

by a preponderance of the evidence and less than that of proof
beyond a reasonable doubt. *See In Re Nowell*, 293 N.C. 235, 247,
237 S.E.2d 246, 254 (1977). Once this Court determines that the
findings of fact by the Judicial Standards Commission are sup-
ported by ample competent, clear and convincing evidence, we may
adopt them as our own. *See In Re Kivett*, 309 N.C. 635, 664, 309
S.E.2d 442, 459 (1993).

The basis of the Commission's recommendation in this case
is, in essence, that respondent conveyed a threat to exercise his
judicial powers for an improper purpose, that is to convene a grand
jury to investigate DSS unless DSS complied with respondent's
wishes that DSS either reinstate a discharged probationary employee
or give the employee a hearing on her termination. Respondent
argues that if the threat occurred, it took place during a conference
at which only three persons were present—DSS Director Donald
Wall, DSS Attorney William McMillan and respondent. Respondent
analyzes the testimony of these three individuals as follows: (a)
DSS Director Wall testified that respondent made the threat; (b)
respondent testified that he did not make the threat; and (c) At-
torney McMillan's testimony is inconclusive. Thus, according to
respondent, the evidence cannot be clear and convincing since the
evidence is in conflict and there is no corroborative testimony.
Again, as our decision to follow the recommendation of the Commis-
sion is based upon a different ground revealed in findings of the
Commission and supported by essentially uncontroverted evidence,
we find it unnecessary to determine here whether clear and con-
vincing evidence before the Commission would support a finding
or conclusion that the respondent conveyed a "threat" to convene
a grand jury for the purposes of retribution or punishing anyone
if Ms. Shell was not reinstated or given a hearing. *See* Webster's
Third International Dictionary, 2382 (1976) ("threat" as an expres-
sion of intent to "inflict evil, injury or damage on another usu.
as retribution or punishment. .. . .")

There was uncontroverted evidence before the Commission
that on 11 July 1990—two days before the 13 July conference
between the respondent, Mr. Wall, and Mr. McMillan—Iredell County
Commissioner and DSS Board Chairperson Alice M. Stewart
telephoned respondent and told him that a discharged probationary
DSS employee, Rebecca Shell, had represented to Ms. Stewart
that: (1) the respondent was a personal friend of said employee,
(2) the respondent was advising the employee, and (3) the respond-

ent felt that the employee was entitled to a hearing before the DSS Board. Ms. Stewart's purpose in calling respondent was to determine his particular interest in the case of the discharged employee in light of this employee's representations to Ms. Stewart.

The respondent interrupted Ms. Stewart and said that Ms. Shell "was a friend of his," that he "felt like she had been treated wrongly by the Department of Social Services" and that he "had advised her that she should seek a hearing before the Board of Social Services and that she should get her job back." Respondent told Ms. Stewart that she "should clean the Department up for one thing, and said that Becky Shell (the discharged employee) should have her job back and that I could use my influence to see that she got a hearing and was rehired, and that I could make this as easy as I wanted to or as hard as I wanted to."

The uncontroverted evidence tending to show that the respondent took it upon himself to give legal advice and counsel to Ms. Shell with regard to her discharge from employment by DSS and undertook in his official capacity to intervene on her behalf is sufficient to establish violations of the North Carolina Code of Judicial Conduct. Specifically, such uncontroverted evidence establishes that the respondent violated Canon 2A by failing to conduct himself "in a manner that promotes public confidence in the integrity and *impartiality* of the judiciary." Canon 2A (emphasis added). Additionally, such evidence establishes that the respondent violated Canon 2B by lending "the prestige of his office to advance the private interests of" Ms. Shell and by conveying or permitting others to convey the impression that Ms. Shell had special influence with him. For the foregoing reasons—which differ from those of the Commission—we agree with the Commission's conclusion that the respondent's conduct in this case violated Canons 2A and 2B of the North Carolina Code of Judicial Conduct and amounted to conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

Respondent's final contention is that even if his actions were improper in this case, they do not constitute willful misconduct in office. We find merit in this contention. We note that nothing else appearing, a violation of Canons 2A and 2B would not necessarily constitute willful misconduct in office.

> *Wilful misconduct in office* is the improper or wrongful use of the power of his office by a judge acting intentionally,

IN RE CORNELIUS

[335 N.C. 198 (1993)]

or with gross unconcern for his conduct, and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption, and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith. *In re Edens, supra* at 305, 225 S.E. 2d 5, 9. *See Spruance v. Commission,* 13 Cal. 3d 778, 796, 532 P.2d 1209, 1221, 119 Cal. Rptr. 841, 853; *Geiler v. Commission on Judicial Qualifications, supra* at 287, 515 P.2d at 11, 110 Cal. Rptr. at 211; *In re Haggerty,* 257 La. 1, 39, 241 So. 2d 469, 478.

*In re Nowell,* 293 N.C. 235, 248, 237 S.E.2d 246, 255 (1977). In *In re Peoples,* 296 N.C. 109, 250 S.E.2d 890 (1978), we took note of this Court's attempt to define willful misconduct and conduct prejudicial to the administration of justice in general terms. "Like fraud," we said,

these terms are "so multiform" as to admit of no precise rules or definition. *Garrett v. Garrett,* 229 N.C. 290, 296, 49 S.E. 2d 643, 647 (1948). It suffices now to say that conduct prejudicial to the administration of justice, unless knowingly and persistently repeated, is not per se as serious and reprehensible as wilful misconduct in office, which is a constitutional ground for impeachment and disqualification for public office. N. C. Const., art. IV, § 4, art. IV, § 8.

*Id.* at 157-58, 250 S.E.2d at 918.

We conclude that while the respondent's course of conduct in this case constitutes conduct prejudicial to the administration of justice that brings the judicial office into disrepute, it does not rise to the level of willful misconduct in office. The evidence shows that while respondent was performing his duties in the capacity of Senior Resident Judge of the Twenty-Second Judicial District, complaints began to be made in increasing numbers regarding the manner in which the Department of Social Services was being administered. Concerned about these complaints, and in an attempt to prevent what he deemed to be an injustice to an employee, respondent first sought to bring the problems to the attention

of the DSS officials. When these efforts were not effective, he considered the idea of an investigation which might reveal the source of the problems and concluded that under the law the grand jury could be used for this purpose. While there is conflicting evidence regarding some of the details of the conduct involved, we give consideration to the fact that respondent has served with distinction as a district court judge and a superior court judge over a period of twenty-two years and the uncontradicted evidence from respected members of the bar to the effect that his character has been excellent. We note further that there was no evidence that respondent was motivated by any desire for personal gain or by the desire to harm or injure any person.

For the reasons stated herein, we conclude that respondent's course of conduct in this case constitutes conduct in violation of Canons 2A and 2B of the North Carolina Code of Judicial Conduct and conduct prejudicial to the administration of justice that brings the judicial office into disrepute. We conclude that respondent's conduct does not rise to the level of willful misconduct in office.

Now, therefore, it is ordered by the Supreme Court of North Carolina, in Conference, that the respondent, Judge C. Preston Cornelius, be, and he is hereby, censured by this Court for conduct prejudicial to the administration of justice that brings the judicial office into disrepute.