*CJP Supp. 32 Opinion
RAYE, Chairperson.
This disciplinary matter concerns Judge David E. Wasilenko (ret.), formerly a judge of the Yuba County Superior Court. Judge Wasilenko is charged in 10 counts, generally, of diverting cases to himself that were not pending before him and that otherwise would not have been assigned to him, and affording defendants—relatives, friends, and friends of friends—special favored procedural handling, and additionally in some instances, substantively lenient disposition of their traffic cases and related offenses. The judge is represented by James A. Murphy, Esq., and Harlan B. Watkins, Esq., of Murphy, Pearson, Bradley & Feeney of San Francisco, California. The examiners for the commission are Commission Trial Counsel Andrew Blum, Esq., and commission assistant trial counsel Bradford Battson, Esq.
*CJP Supp. 33 Three special masters were appointed by the Supreme Court to hear and take evidence and to report to the commission. The masters are Hon. Rodney Davis, Associate Justice of the Court of Appeal, Third Appellate District; Hon. Ramona J. Garrett, Judge of the Solano County Superior Court; and Hon. John W. Runde, Judge of the San Mateo County Superior Court. They held an evidentiary hearing in Sacramento; in their final report to the commission, dated September 30, 2004, they found that Judge Wasilenko committed willful misconduct in six counts, prejudicial misconduct in three counts, and improper action in one count, based on findings and conclusions that we discuss here. We conclude that there were nine instances of willful misconduct, in counts two through 10, and that count one involved improper action.
Judge Wasilenko retired from his judicial office effective January 25, 2005, the day before the final oral argument before the commission. The judge did not appear at the oral argument hearing on January 26, 2005,[1] and both counsel stipulated at the hearing to waive oral argument before the commission. Accordingly, on that date the matter was taken under submission on the written record.
Article VI, section 18, subdivision (d) of the California Constitution, as pertinent to the disciplinary options available to the commission in this matter, provides that the commission may “censure a judge or former judge or remove a judge” for willful or prejudicial misconduct, and provides the commission may bar a former judge who is censured from receiving an assignment, appointment, or reference of work from any California state court. At least in light of the timing of the judge’s retirement in this matter, we appear to be constitutionally prohibited by the foregoing from imposing discipline more severe than a censure and a bar against Judge Wasilenko. We do impose such maximum discipline and order Judge Wasilenko censured and barred, based on the statement of facts and conclusions and applicable law set forth in this decision.
I. Findings of Fact
The operative pleading setting forth the charges against Judge Wasilenko is the first amended notice of formal proceedings, filed on November 18, 2003. Based on the evidence adduced at the hearing before the masters, they found most of the essential facts to be true as charged. To the extent that the masters found certain facts not to have been proven, the examiner does not object, *CJP Supp. 34 and we concur. However, the judge objects to the lack of certain findings by the masters, and we will discuss that topic separately. Our findings here are a summary of the masters’ findings; we note in brackets or through more extended discussion any significant variation between our own findings and those proposed by the masters.

Count One-

Sheila Messick received a speeding ticket on September 11, 1999. Messick is married to the judge’s first cousin and the judge considers her a close relative. On Messick’s initiative, she met with the judge in his chambers on September 24 and discussed a family matter with him. Thereafter, the topic of conversation switched to her ticket and the available options to resolve it. With Messick present, Judge Wasilenko had the file brought to his chambers by a clerk. The case would not have come before Judge Wasilenko in the ordinary course of judicial business and there was no representative of the district attorney’s office present. Upon reviewing the file, the judge told Messick the amount of the fine, verified that she was eligible to attend traffic school, and told her the cost of attending school. Without further involvement of the judge, Messick did pay the standard fine and attended traffic school.
“The Judge did not believe he was hearing the matter or otherwise taking any action on Messick’s citation. Instead he was answering her questions regarding the nature of the charges and expenses she was facing.” Nonetheless, if the case had come before him through a regular assignment to his department, Judge Wasilenko believes he would have been disqualified under Code of Civil Procedure section 170.1 from hearing it.

Count Two

Heather Robinson was cited on October 25, 1999, for an expired vehicle registration. Robinson lived with the judge and his family from 1996 to 1998 while she was in high school, and again for several months during mid-1999. The relationship between the judge and Robinson is considered by both of them as that of father and daughter.
Robinson was not living with Judge Wasilenko when she received the citation, but she received mail via the judge’s post office box, where a courtesy notice relating to the citation was mailed to her. The judge learned of the citation when he retrieved the notice from his mailbox.
It was stipulated that Robinson’s vehicle was reregistered on November 15, 1999, although neither the judge nor Robinson has any recollection of any *CJP Supp. 35 discussion between them concerning the matter. Recollections by the judge and Robinson of other details are equally cloudy.
However, it is clear that Robinson “never appeared before [Judge Wasilenko] on the ticket.” Nonetheless, on November 18 (three days after the car was reregistered), the judge requested that a clerk bring Robinson’s file to his chambers. We find that the judge was alone in his chambers when the clerk arrived with the file.
Robinson’s case would not have come before Judge Wasilenko in the ordinary course of judicial business and he made no disclosure, on the record or otherwise, concerning the familial relationship between him and the defendant. The judge wrote “dismissed as corrected” on the file and handed it back to the clerk. A statutorily mandated $10 administrative fee was not imposed by the judge. The masters resolved conflicting inferences and found the judge did have proof of the correction (i.e., evidence of the reregistration) prior to dismissing the case. We accept the masters’ resolution and finding.
In their findings relating to count two, the masters describe certain generalized policies and procedures of the Yuba County Superior Court concerning “correctable” offenses.[2] These general practices come into play in other counts as well and are summarized as follows:
—In cases involving correctable traffic infractions, when a person mails or personally presents to a clerk in the clerk’s office some proof of correction that has been signed off [verified] by law enforcement, a clerk dismisses the citation [closes the case] without any judicial involvement. In such instance, if there is no verification of the correction, a clerk submits the citation and available documentation to a judicial officer in chambers for a determination of the adequacy of proof of correction.
—There is a $10 dismissal fee fixed by Vehicle Code section 40611 applicable to the dismissal of such correctable infractions. Judge Wasilenko is of the view that he has discretion to waive this fee, and frequently does so, for financial hardship and to alleviate inconvenience to defendants.
—If someone sends documentary proof of correction to the clerk’s office without paying the $10 dismissal fee, the documents are returned without dismissing the citation unless the party also has sent money to pay a fine for an accompanying offense listed in the citation. In the latter instance, a clerk will forward the file to a judge with a request to waive the $10 fee [in order *CJP Supp. 36 to be able to close the file, thereby reducing the administrative burden of collecting the final $10. Under no circumstance is a clerk permitted independently to waive the $10 fee.][3]
—When original documents are sent in as proof of correction, they are placed in the file. If original documents are presented to a clerk at the window, the clerk makes a copy for the file, or a notation on the file, and returns the original. If proof of correction is presented in open court, the clerk includes a notation in the minutes that the citation was dismissed with proof of correction.

Count Three

Casey Landis was cited on December 14, 1999, for failure to stop at a stop sign. Landis and the judge knew each other through a variety of church and community connections. Landis also was friends with the judge’s daughters and had visited the judge’s home about three times; the judge was friends with the defendant’s parents.
Prior to the due date for paying the fine, Landis telephoned the judge and told him that he was about to enter the military and therefore needed to clear up the pending citation; he inquired on the telephone whether he could do community service in lieu of paying the fine. The judge told Landis he would need to appear in court and that, then, the judge would “see what he could do” regarding community service.
On March 14, 2000, the judge had a clerk bring Landis’s file to chambers and told the clerk he would handle the case as a “walk-in” the next day. On March 15, Landis appeared in open court before Judge Wasilenko. The judge made no disclosure concerning his relationship with Landis or Landis’s parents. After Landis pled guilty, he told the judge he could not pay the fine; his request to perform, community service was granted and the fee for attending traffic school was waived by the judge. The masters infer, based on the relationships between the judge and the defendant and his parents, that the judge acted, in part, “to provide a favored procedural track through the court system for someone he knew well.” We concur. The judge’s substantive disposition of Landis’s citation was not more lenient than Landis otherwise likely would have received, and his financial situation made him a suitable person to have his fine converted to community service.

*CJP Supp. 37
Count Four

Casey Landis—the same defendant as in count three, who had a direct personal relationship with the judge and the judge’s daughters, as well as connections with the judge through his parents—was cited on September 22, 2000, for a malfunctioning vehicle light. On October 29, 2000, he was cited again for the malfunctioning light as well as for failing to have proof of insurance. Landis failed to appear, bail was increased and holds were placed on his driver’s license.
On March 26, 2001, Landis came to court on a day that “walk-in” calendars were not scheduled. He met with Judge Wasilenko in chambers. The judge had a clerk bring the files for both citations to chambers, and based on Landis showing proof that he had insurance and that the light had been fixed, the judge released the holds on Landis’s license and ordered him to complete community service under the judge’s personal direction. The finding that the judge had proof of the corrections prior to his taking judicial action is based on the masters’ resolution in the judge’s favor of conflicting inferences. We accept the masters’ resolution and finding.
The masters infer, based on the relationships between the judge and the defendant and his parents that the judge acted, in part, “to provide a favored procedural track through the court system for someone he knew well.” We concur. There was no evidence that Landis was in need of expedited assistance in resolving his citations or that there was any inability on his part to use “standard court procedures.” The sentence imposed, however, was not more lenient than that Landis otherwise likely would have received, and the 16 hours of community service may have been on the harsh side.

Count Five

Nathan Sokoloski was cited on August 10, 2001, and charged with two misdemeanors on September 5, relating to his being under age 21 while driving a motor vehicle containing alcoholic beverages. There are longstanding close connections between the judge and both Nathan and his parents of a nature requiring Judge Wasilenko to disqualify himself.
It is standard practice in Yuba County in cases such as Sokoloski’s, when a minor is charged for the first time with possession of alcohol, to divert the defendant to a youth alcohol program run by Pathways, and upon completion of the program, for the case to be dismissed. Typically, the district attorney does not object to the referral to Pathways or to the later dismissal. Normally, however, a minor defendant would need to appear in court, or hire an attorney to appear, in order to be offered the Pathways referral.
*CJP Supp. 38 Sokoloski’s case was scheduled for arraignment on September 12, 2001, in Department 5 (Judge Wasilenko sat in Dept. 4). Prior to September 11, Nathan’s father, Jerry Sokoloski, told Judge Wasilenko at a Kiwanis meeting about Nathan’s case and that Nathan was attending a fire training program and could not come to court on the 12th, and inquired what to do. The judge explained the Pathways referral program, stated it was discretionary with the district attorney, and said he would talk to the district attorney about a continuance so that Nathan would not need to leave training to come to court.
On September 11, Judge Wasilenko arranged for Sokoloski’s case to be heard in his department (despite its being assigned to a different department for the next day). He invited Deputy District Attorney Veronica Henderson and Attorney Jud Waggoman—both of whom were in court on other matters—into chambers. Neither Nathan nor any attorney retained to represent him was present in court or in chambers. The judge asked Waggoman to act as a “ ‘friend of the court’ ” in order to “ ‘make a special appearance’ so that both sides would be present” when he continued the case “to enable Sokolo[]ski to stay at the fire academy.”
In chambers, the judge disclosed to Henderson and Waggoman that he knew the defendant and his family, told them that the defendant wanted to be referred to Pathways and that he, Judge Wasilenko, “intended to send him there, but that one of SokoloQski’s parents had told the Judge that Sokolo[]ski . . . would be unable to appear in court on September 12, 2001.” Henderson consented to a continuance to November 1, and Waggoman ostensibly waived time on behalf of the defendant. Judge Wasilenko continued the matter to November 1, ordered it transferred back to Department 5, and stated that he, the judge, personally would provide notice to the defendant and to Pathways.
After the in-chambers conference on September 11, one of Sokoloski’s parents told the judge that Nathan would need more time to complete the Pathways program because the fire training program would not be completed until November 2001. The judge replied that the alcohol program could be continued until after Nathan completed his fire training, and based on that assurance from the judge, the parents felt no need to retain counsel to represent Nathan. Following up on the new information about the delay in Nathan’s completion of the fire training, Judge Wasilenko had a clerk bring the file to his chambers on September 20, and in chambers told Deputy District Attorney Henderson that Sokoloski needed additional time to complete the Pathways program. Henderson had no objection to additional time being granted, and the judge continued the matter to March 5, 2002, and again transferred the case back to the department in which it originally was scheduled to be heard.
*CJP Supp. 39 The judge knew he was having an ex parte communication about a pending case when he spoke with Nathan’s father. As of the time of the hearing before the masters, the judge was of the view that “since he knew the Sokolo[]ski family and spoke with the defendant’s father about the case, he should have recused himself from the case.”
The masters infer, based on the relationships between the judge and the defendant and his parents, that the judge acted, in part, “to provide a favored procedural track through the court system for someone he knew well.” We concur. However, despite the judge’s intercession, it does not appear that Nathan received judicial rulings or referrals different from those he likely would have received had he (or any retained counsel) presented the same information to a different judge with Veronica Henderson as the prosecutor.

Count Six

Ryan Heenan was a passenger in the car driven by Nathan Sokoloski (count five) and was cited on August 10, 2001, and criminally charged with a misdemeanor on September 5 for being an underage passenger in possession of alcohol in a motor vehicle. Although Heenan knew the judge and his daughters, the judge does not recall knowing Heenan. As a first-time youthful alcohol offender, Heenan was a suitable candidate for diversion to the Pathways program. (See discussion of Pathways in count five, ante, at p. 37.)
Heenan failed to appear on September 6, 2001, in Department 5 for arraignment; Judge Dawson ordered the issuance of a bench warrant which was held until October 25, when Heenan failed a second time to appear, whereupon the warrant issued and was delivered to the Marysville Police Department [to effectuate the defendant’s arrest].
At some time after they both were cited, Nathan Sokoloski suggested to Heenan that Heenan should talk to Judge Wasilenko about “what could be done to take care of the case.” Nathan told Heenan that he, Nathan, was going to talk to the judge or already had done so. On November 5, Heenan went to the judge’s courtroom, and after he had conversations with a couple of bailiffs, Heenan was invited by the judge into chambers. There was nothing scheduled in Heenan’s case that day, and misdemeanor arraignments were heard in Department 5 before Judge Dawson at the time. Heenan introduced himself to Judge Wasilenko, showed him the citation, and told him he had not appeared on September 5 because he was “fighting a fire in Yellowstone National Park.” The judge had a clerk bring Heenan’s file to chambers; it was apparent from the file that Heenan was one of Sokoloski’s codefendants in that the one complaint named three defendants—Sokoloski and Heenan, as well as Timothy Goetz, the defendant in count seven.
*CJP Supp. 40 The masters resolved conflicting inferences in the judge’s favor to find that he obtained the advance approval of Deputy District Attorney Veronica Henderson to proceed in her absence, and to recall the bench warrant, reinstate Heenan on his own recognizance (O.R.), and continue the case to give Heenan time to complete the Pathways program. We accept the masters’ resolution and finding. Judge Wasilenko told Heenan to enroll in Pathways, and stated that when Heenan completed the program, his case would be dismissed. The judge continued the case to December 17, 2001, for proof of completion of the Pathways program. The masters infer that the judge’s intent was to spare Heenan the need to be booked on the warrant when he had good cause for not appearing, and to afford him the opportunity of diversion to Pathways, such as other similarly situated defendants generally are. We concur.
When the judge recalled Heenan’s warrant, he was not aware that it had already been sent to law enforcement to effectuate Heenan’s arrest. Nonetheless, Judge Wasilenko was of the view that judges retained discretion to recall such a warrant, even though according to court policy, court clerks could not place a defendant on a walk-in calendar without the defendant first being booked into jail on the warrant. The court policy was adopted by the county judges at a meeting on January 25, 2000, as reflected in the minutes of the meeting introduced into evidence before the masters as exhibit 9, providing as follows: “. . . Adopt new policy as follows: On FTA’s [failures to appear] if the warrant has already gone to the law enforcement agency and defendant requests to be placed on walk-in calendar the defendant needs to be booked on said warrant, if warrant has not gone out to the agency, then defendant can be placed on the walk-in calendar on a specific date and time. . . .” (Italics added.)
The masters construe the court policy as not depriving the judges of discretion to recall a warrant even after it had gone to law enforcement. They believe it deprived court clerks of any discretion, however. In other words, if a defendant came to the clerk’s window with a warrant that had gone to law enforcement, the defendant would need to be booked prior to being allowed access to a judge through the walk-in calendar or otherwise. We concur in the masters’ interpretation of the court policy. As noted by the masters, “being booked into jail is necessarily a traumatic experience.” It is significant that a defendant such as Heenan, who bypassed the clerks, with direct access to the judge in chambers, avoids the booking trauma. We find that this is a distinct procedural and substantive benefit to Heenan that resulted from the special access that Judge Wasilenko afforded him.

*CJP Supp. 41
Count Seven

Timothy Goetz (like Ryan Heenan in the previous count) was a passenger in the car being driven by Nathan Sokoloski (count five) and was cited on August 10, 2001, and criminally charged with a misdemeanor on September 5 for being an underage passenger in possession of alcohol in a motor vehicle. As a first-time youthful alcohol offender, Goetz also was a suitable candidate for diversion to the Pathways program. (See discussion concerning Pathways, ante, at p. 37.)
Goetz appeared before Judge Dawson in Department 5 on September 6, and was referred to Pathways and released on O.R., with the case continued to November 1 for proof of completion of the alcohol program. Goetz failed to appear on November 1 and Judge Dawson ordered the issuance of a bench warrant; the complaint was amended to add a charge for failure to appear— another misdemeanor. For reasons that are not clear, Judge Wasilenko arranged to have Goetz’s file brought to chambers the following day, November 2. The masters do find, however, and we concur, that no causal connection was shown between Judge Wasilenko requesting the file and the fact that the warrant was not sent to law enforcement.
On November 5, the same day as Heenan (count five) met with Judge Wasilenko in chambers, Goetz also met with the judge in chambers. The judge testified that he recalled being told by Goetz that he too had missed a court date because he was fighting fires. As with Heenan, the masters resolve inferences in the judge’s favor to find that he again obtained Veronica Henderson’s advance approval, and then rereleased Goetz on O.R., rereferred him to Pathways, and continued his case for proof of completion of the Pathways program. We accept the masters’ resolution and finding. Goetz completed the Pathways program in January 2002 and his case was dismissed.
As with Heenan, the masters again infer that the judge’s intent was to spare Goetz the need to be booked on the warrant when he had good cause for not appearing, and to afford him the opportunity of diversion to Pathways, such as other similarly situated defendants generally are. We concur. It does not appear that Goetz received judicial rulings or referrals different from those he likely would have received had he (or any retained counsel) presented the same information to a different judge with Veronica Henderson as the prosecutor.

Count Eight

Anthony Franks was cited on December 11, 2001, and criminally charged on December 21 with a misdemeanor for driving with a suspended license. *CJP Supp. 42 He failed to appear in court on January 10, 2002, and Judge Dawson issued a bench warrant that was signed by Judge Curry on January 17, 2002, and delivered to the Marysville Police Department. A Department of Motor Vehicles hold was placed on Franks’s license on January 16, 2002. Franks is a friend of Heather Robinson, the judge’s surrogate daughter, but the judge did not recognize Franks when he met him in chambers and does not know him.
On March 6, 2002, Franks accompanied a defendant named Jacqueline Morris to her appearance in court before Judge Wasilenko that day. She was sentenced to community service and was told by the judge to wait until the end of the court session so that the judge could give her contact information regarding her community service. At the end of the calendar, Franks accompanied Morris into chambers. When the judge was finished dealing with Morris’s referral to community service, Franks “inquired about Heather.” The masters determined, and we concur, that Franks did the name dropping concerning Heather Robinson at the outset of his conversation with the judge. Following a brief discussion about Heather, Franks said he had a failure-to-appear matter, and wondered if he could get a walk-in appointment. The judge said “We’ll take a look,” and requested a clerk bring Franks’s file to chambers. In the interim, the judge asked Franks why he had failed to appear. Franks responded, untruthfully, that he had been in the Butte County jail; the judge accepted Franks’s false explanation at face value.
A clerk brought Franks’s file to chambers. The case was not assigned to Judge Wasilenko and arraignments were handled in a different department. Again, the masters resolve inferences in the judge’s favor to find that he again obtained Veronica Henderson’s advance approval, and then recalled the bench warrant, ordered Franks released on O.R. and set the matter for arraignment on May 30, 2002. We accept the masters’ resolution and finding. The judge did not require Franks to be booked on the warrant. As in count six, the masters again found that in not requiring Franks to be booked, Judge Wasilenko did not violate the court policy (see discussion of court policy, ante, at p. 40) that disallowed the court clerks any discretion concerning booking on a warrant that had gone to law enforcement. Again, we concur in the masters’ interpretation of the court policy. But as with the situation involving Ryan Heenan who bypassed the clerks, Franks also avoided the trauma of being booked by reason of his direct access to the judge in chambers. We find that this is a distinct procedural and substantive benefit to Franks that resulted from the special access that Judge Wasilenko afforded him.

*CJP Supp. 43
Count Nine

Erin Porter was cited on June 14, 2002, for failing to stop at a stop sign, failing to have proof of insurance, and for having an expired registration. The judge coached Porter in softball for a couple of years while she was in high school. She calls him “Dave” and is a friend of one his daughters. The judge knows Porter’s parents and knows her, but does not consider her a friend.
On July 11, 2002, Erin Porter, accompanied by her friend, Erin Hendrix, went to the courthouse where they coincidentally met a court clerk, Lisa Perkins-Sparks, who was a friend of Hendrix. Porter was uncertain where she should go concerning her ticket, and Perkins-Sparks directed her to Department 5, which was presided over by Judge O’Connor at the time. Perkins-Sparks then entered Judge Wasilenko’s chambers and conveyed greetings to him from “the Erins”; he asked that they be shown in, which Perkins-Sparks did, and then departed.
In chambers, Porter told Judge Wasilenko she thought she was going to have a trial later that morning on a ticket she had received. She told Judge Wasilenko she was not driving as fast as was stated on the ticket and asked him how to contest the ticket. After verifying from Porter that she had not stopped at the stop sign, as charged, he told her it did not matter how fast she was going; the issue was the failure to stop. The judge admits he counseled Porter to take responsibility for her actions, but denies that he was giving her legal advice concerning the feasibility of mounting a defense. The judge knew that if Porter wanted to contest guilt, her trial would be in a different department from his and that it would not occur until one or two months in the future.
Porter then told Judge Wasilenko she wanted to plead guilty and take care of the matter. Instead of sending her to Department 5 or the clerk’s office, the judge had a clerk bring Porter’s file to his chambers. Porter pled not guilty or nolo contendere to the stop sign violation and showed the judge and the clerk proof of registration and insurance as of the time of the citation. The judge imposed a fine and penalty assessment for the stop sign violation and dismissed the insurance and registration charges. He did not impose a statutory $10 fee due in connection with the dismissal of the registration violation.

Count 10

Kris Kraus was cited on January 30, 1999, for an expired registration and cracked windshield. Following her failure to appear as agreed, a hold was placed on her license on March 23, 1999. The judge and Kraus are longtime *CJP Supp. 44 friends and former neighbors on the same street. Their children played together, and the judge coached Kraus’s two sons in Little League.
On June 10, 1999, Kraus went to Department 5 and waited all morning for her case to be heard by Judge Dawson, the judge presiding in that department. Her case had not been heard by noon; during the lunch recess, she coincidentally met Judge Wasilenko in the corridor. They talked about their families and Kraus went into the judge’s chambers with him. In response to the judge’s inquiry, Kraus said she had a ticket for which she had proofs of correction, adding that she had waited all morning for her case to be called and that she needed to return to work. The judge looked at Kraus’s proofs, had a clerk bring the file to his chambers, and then dismissed the citation and the associated failure to appear without imposing the statutory $10 correction fee.

Factual Issues Concerning Ex Parte Communications—Canon 3B(7)

There is an issue that runs throughout this case, affecting both the findings and conclusions, that arises out of the policy of the Yuba County District Attorney not to staff pure traffic infraction cases in which the defendant appears without counsel and does not seek a trial. The policy is described by the masters as follows:
“The Yuba County District Attorney does not participate in the adjudication of traffic infractions unless the infraction is charged along with felonies or misdemeanors in a criminal complaint or a person receiving a citation charging an infraction is represented by an attorney' and elects to contest the infraction in a court trial. In all other cases in which a citation is pending in the Yuba County Superior Court, the judges adjudicate the infractions without any involvement by the district attorney.
“There is no agreement with the Yuba County District Attorney that a judge need not disclose a conflict or potential conflict before adjudicating a traffic infraction or criminal charge.”
Patrick McGrath, the Yuba County District Attorney, testified before the masters that the nonappearance policy is driven by budgetary and related personnel constraints and we so find. As correctly noted by the masters, however, McGrath made clear that he did not intend the policy to excuse a judge from the judge’s ordinary duty to disclose an actual or potential conflict in any case. The masters found that implementation of the policy necessarily resulted in a judge having ex parte communications with the propria persona defendants who appeared on pure traffic infraction, nontrial matters.
Normally, such ex parte communications would contravene California Code of Judicial Ethics canon 3B(7) (all further references to a canon are to *CJP Supp. 45 the California Code of Judicial Ethics). Nonetheless, to the extent that a judge is hearing such a case in the ordinary course of judicial business, we agree with the masters that by absenting himself, the district attorney impliedly, if not expressly, consents to the ex parte communications that necessarily occur in the judicial disposition of such matters. Adjudication of cases under such circumstances clearly is less than ideal. Moreover, the exigencies of the situation call for heightened vigilance on the part of the judge. We concur in the views expressed by the court in People v. Marcroft (1992) 6 Cal.App.4th Supp. 1, 4 [8 Cal.Rptr.2d 544] on this point: “Economic realities preclude the presence of prosecuting attorneys at most infraction trials .... However, a judge involved in such a proceeding must be most circumspect in avoiding an appearance of lack of impartiality. The very absence of a prosecuting attorney makes it all the more important that the court at such trials use the utmost care to preserve not only the reality but also the appearance of fairness and lack of bias.”
We believe that all of the foregoing discussion rests on an assumption that the propria persona uncontested pure infraction cases are being heard in the ordinary course of judicial business. However, none of the cases that form the basis of the charges against Judge Wasilenko fit within that pattern. As will be discussed, the judge abused his power by hearing cases that were not legitimately pending before him. Mr. McGrath was not asked about the applicability of his policy to such a situation. In view of the silence of the record, we deem it inappropriate to make findings or conclusions based on assumptions. Further, since a resolution of the issue would not affect the outcome of our ultimate decision, we do not believe it necessary to refer the matter back to the masters for the taking of additional testimony on this limited point.
In the absence of evidence, we decline to make any findings or conclusions concerning canon 3B(7) except as to the counts where it is clear that the nonappearance policy is inapplicable. The masters found the policy inapplicable in count five because Nathan Sokoloski was charged with misdemeanors. We concur, and also agree with the masters that the judge’s ex parte communications in connection with count five were in violation of canon 3B(7). (See discussion, post, at pp. 52-53.) Following the same line of reasoning, we find that since misdemeanors also were charged against Ryan Heenan (count six), Timothy Goetz (count seven) and Anthony Franks (count eight), the nonappearance policy again was inapplicable, and the ex parte communications that took place in each of those counts were in violation of canon 3B(7). (See discussion, post, at p. 55.)

*CJP Supp. 46
Factual Issues Concerning Demographics

Judge Wasilenko, through his counsel, objects to the omissions in the masters’ report of the facts that the judge was bom in Marysville, has lived in Yuba County his entire life and that both Marysville and Yuba County are sparsely populated. No specific relevance is attributed to these facts, but counsel make passing references to “Marysville is a small community” and that the judge “regularly sees individuals that he is familiar with on some level before him in court on traffic matters.” The suggested import of these facts is not explained.
By their terms, the canons impose uniform statewide standards. Whenever an assigned case involves a party the judge “knows,” the judge must be particularly vigilant to ensure the appearance and reality of independence and impartiality. The situation may arise more frequently in a small town than a major metropolitan area, but the judge’s ethical duties are the same irrespective of population statistics. In any case, the demographics of Marysville and Yuba County are irrelevant to the misconduct engaged in by Judge Wasilenko. Repeatedly diverting nonassigned cases so as to be in a position to afford preferential judicial treatment to family, friends and others specially situated is improper under the canons and intolerable in every county in this state.
II. Conclusions of Law

The Three Levels of Judicial Misconduct

There are three levels or types of judicial misconduct described in article VI, section 18, subdivision (d), of the California Constitution that may subject a judge to discipline by the commission. The most serious, willful misconduct, is defined by the California Supreme Court as consisting of (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his or her judicial capacity. (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1091 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadmanf, Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260] (Dodds).) The use of the power of judicial office to benefit a friend is a “casebook example of wilful misconduct.” (McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186, 194 [260 Cal.Rptr. 557, 776 P.2d 259] (McCullough).)
In order to determine whether a judge’s conduct is “unjudicial” under the first prong of the foregoing standard, the conduct is measured with reference to the California Code of Judicial Ethics. (Dodds, supra, 12 Cal.4th at p. 172; accord, Oberholzer v. Commission on Judicial Performance (1999) *CJP Supp. 47 20 Cal.4th 371, 395 [84 Cal.Rptr.2d 466, 975 P.2d 663].) “ ‘The failure of a judge to comply with the canons “suggests performance below the minimum level necessary to maintain public confidence in the administration of justice.” ’ ” (Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 878 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams II), citing Adams v. Commission on Judicial Performance (1994) 8 Cal.4th 630, 662 [34 Cal.Rptr.2d 641, 882 P.2d 358] (Adams I).)
The “bad faith” requirement for willful misconduct is satisfied when a judge is “(1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.)
The “judicial capacity” prong of the willfulness test has been defined as follows: “A judge is acting in a judicial capacity while performing one of the functions, whether adjudicative or administrative in nature, that are associated with the position of a judge or when the judge uses or attempts to use the authority of the judicial office for an improper purpose.” {Broadman, supra, 18 Cal.4th at p. 1104, citing Dodds, supra, 12 Cal.4th at p. 172.)
Prejudicial misconduct is the second most serious type of judicial misconduct, and is a lesser included offense in willful misconduct. (Gonzalez v. Commission on Judicial Performance (1983) 33 Cal.3d 359, 369, fn. 5 [188 Cal.Rptr. 880, 657 P.2d 372].) A primary distinction between willful and prejudicial misconduct is the presence or absence of bad faith. “Unlike wilful misconduct, prejudicial conduct does not require the presence of bad faith, but may occur when a judge, though acting in good faith, engages in conduct that adversely would affect the esteem in which the judiciary is held by members of the public who become aware of the circumstances of the conduct.” (Adams II, supra, 10 Cal.4th at 878, citing Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 832 [264 Cal.Rptr. 100, 782 P.2d 239] (Kloepfer), and McCullough, supra, 49 Cal.3d at p. 191; accord, Broadman, supra, 18 Cal.4th at p. 1092.) Prejudicial misconduct may be committed by a judge either while acting in a judicial capacity, or in other than a judicial capacity. (Adams II, supra, 10 Cal.4th at p. 878, citing Kennick v. Commission on Judicial Performance (1990) 50 Cal.3d 297, 314 [267 Cal.Rptr. 293, 787 P.2d 591].)
The least serious type of misconduct is improper action, which consists of conduct that violates the California Code of Judicial Ethics, but which does not rise to the level of prejudicial misconduct. (Rothman, Cal. *CJP Supp. 48 Jud. Conduct Handbook (2d ed. 1999) Improper Action or Dereliction of Duty, § 13.29, pp. 386-387 (Rothman).) Improper conduct includes conduct that an objective observer aware of the circumstances would not deem to adversely affect the reputation of the judiciary. (See Adams II, supra, 10 Cal.4th at p. 899 [judge’s acceptance of gifts violated canons but in and of itself did not jeopardize the judge’s objective appearance of independence and impartiality and thus was improper conduct, not prejudicial misconduct].)

Judge Wasilenko’s Two-track System of Justice

In 2002, we removed Judge Platt from office for misconduct that included illegal “ticket fixing.” (Inquiry Concerning Platt (2002) No. 162, Decision and Order Removing Judge Platt from Office, p. 1 [48 Cal.4th CJP Supp. 227, 231] (Platt). In an effort to distinguish Judge Wasilenko from Judge Platt, the judge’s counsel assert that “Judge Wasilenko did not fix any tickets.” (Original underscoring.) Counsel claim, instead, that the judge was dealing with what they call “correctable offenses” or “fix-it violations” that were subject to dismissal anyway upon proof that the violations had been corrected, suggesting that his actions therefore were proper.
There are three difficulties with these assertions. First, not all of the violations that are the subject of the charges against Judge Wasilenko were “correctable.” In fact, most of the cases did not involve violations that fell within that category: Sheila Messick’s speeding ticket in count one was not correctable; Casey Landis’s stop sign violation in count three was not correctable; the underage alcohol violations by Nathan Sokoloski, Ryan Heenan and Timothy Goetz in counts five, six and seven were not correctable, nor were the failures to appear by Heenan and Goetz; Anthony Franks’s failure to appear in count eight was not correctable; and Erin Porter’s stop sign violation in count nine was not correctable.
The second problem with the argument is that none of the subject cases was pending before Judge Wasilenko or would have come before him in the ordinary course of judicial business or normal case assignments. It is an abuse of power for a judge to take action in cases not pending before the judge. (Rothman, supra, Abuse of Judicial Power, § 3.40, p. 85 & fn. 155, citing four disciplinary decisions by this commission.) A judge is dutybound to “hear and decide all matters assigned to the judge except those in which he or she is disqualified.” (Canon 3B(1); see Code Civ. Proc., § 170.) The measure of the duty is coextensive with the limits of authority, that is, the judge is obligated to determine assigned cases, and forbidden to handle cases that are not before the judge as part of normal court business. Judge Wasilenko’s entire course of conduct in all 10 counts was completely improper and constituted a wholesale abuse of judicial power.
*CJP Supp. 49 There is a final and most important deficiency in the judge’s argument. The determination of whether he violated the canons does not turn on whether there was a “fix” or just a “fix-it.” Rather, the gravamen of Judge Wasilenko’s wrongdoing is that he set up a two-track system of justice, with special handling available for relatives, friends and others with special connections. The vice in this favoritism does not turn on the line-drawing the judge attempts, but rather, in the damage to the reputation of the judiciary from the double standard. Two earlier decisions by this commission illustrate the point.
In the first illustrative case, Judge Bruce A. Clark was publicly reproved in 1989 for one incident of misconduct involving two traffic tickets given to the daughter of a member of the California Assembly. In June 1988, the judge had an ex parte conversation in his home with the assemblywoman concerning her daughter’s tickets. The cases were pending before Judge Clark, and based on the communication from the legislator, the judge struck the requirement that the daughter appear in court on the tickets, permitted her to attend traffic school in connection with both tickets, and ordered that both speeding counts be dismissed upon receipt of a traffic school completion certificate. The commission noted in its reproval letter to Judge Clark: “Because the communication from Assemblywoman Wright was in your own home, and because your judicial acts were in chambers, the prosecutor had no opportunity to participate in these proceedings, nor had the public any opportunity to observe them. The judicial decisions you made, though lawful, were unusually lenient.” (Italics added.)
The commission determined that the judge’s conduct violated the canons then in effect that correspond to the current canons 2A (requiring judges to promote public confidence in the integrity and impartiality of the judiciary), 2B(1) (prohibiting a judge from conveying or permitting others to convey the impression that any individual is in a special position to influence the judge), and 3B(7) (prohibiting ex parte communications in a pending proceeding).
In the second illustrative case, Judge B.J. Bjork was publicly admonished in 1995 for two incidents of misconduct. In the first underlying case, Judge Bjork was contacted in March 1994 by the clerk for another judge at that judge’s request (Judge A), requesting that a member of Judge A’s family, who had received a traffic citation, be permitted to attend traffic school. After Judge Bjork rejected the clerk’s request, Judge A approached Judge Bjork personally, explained that the relative had previously failed to complete traffic school and requested that Judge Bjork grant the relative a second chance to attend traffic school. Judge Bjork granted the request. A few days later, in the second incident, Judge A again approached Judge Bjork on behalf of the same relative regarding a different traffic citation for driving with an inadequate muffler, for failing to be in possession of a valid driver’s license, and for *CJP Supp. 50 failure to appear. Judge A indicated that he owned the car and was responsible for the inadequate muffler and for the relative’s failure to appear. Based on those representations, and Judge A’s statement that he would “take care of the other counts charged in the citation, and without any proof of correction, Judge Bjork dismissed the failure to appear charge, a misdemeanor.”
As with Judge Clark, Judge Bjork was found to have violated the equivalent of today’s canons 2A and 2B(1). There was no mention in the decision of violations of the ex parte canon, although that would appear to have occurred as well.
The Clark case involved only one incident, and there were only two incidents in the Bjork matter. Both cases resulted in public discipline. Judge Clark did not “fix” any ticket in the sense that the defendant did not receive a sentence she was not entitled to under the law. In the commission’s words, “the decisions . . . made, though lawful, were unusually lenient.” This is the very distinction that Judge Wasilenko raises with his emphasis on the fact that he was dealing with “fix-it” or “correctable” infractions. The distinction was not deemed determinative in the Clark matter.
Notwithstanding the “lawfulness” of Judge Clark’s actions, he was publicly reproved for the one incident because of the appearance of favoritism and special access and the ex parte contact. The commission imposed discipline because of the favoritism and special treatment and the resulting harm done to the reputation of the judiciary from the appearance of special access and influence of a legislator. That the treatment was “lenient” would seem to refer to the fact that the legislator’s daughter was granted a preferential procedural track that avoided any appearance in court—facts that correspond to Judge Wasilenko’s preferential procedural fast track in counts two through 10.
Judge Bjork, on the other hand, would appear to have “fixed” the second ticket as respects the misdemeanor charge. Dismissal of that charge seems like a classic “fix,” even though the point is not discussed in the decision. Judge Bjork’s public admonishment, however, also was based on the appearance of leniency and favoritism and special access arising out of the fact that the defendant was a relative of another judge.
The Clark matter involved “lenient but lawful” treatment of the defendant, while the Bjork matter involved “lenient and unlawful” handling by the judge. In both instances, public discipline was imposed for quantitatively minimal misconduct because the type of misconduct so seriously damages the reputation of the judiciary. The analysis does not turn on the lawfulness issue, but rather, on the leniency, special handling, favoritism, being influenced, and the resulting damage to the judicial institution. The *CJP Supp. 51 defendant is not sanctioned, even in the case of the classic “fix,” but rather, the judge is disciplined for harming the reputation of the judiciary by setting up a preferential system for dispensing favors for family or friends or others specially situated. This is true notwithstanding that there may be greater moral reprehensibility when there is an “unlawful fix.”
These two cases also highlight that the gravamen of the wrongdoing is the two-track system of justice—one for those with special access to the judge, and the other for everyone else. The nub of the problem is the appearance or reality that Lady Justice is blindfolded. Rather than justice being dispensed with an even hand without regard to who is before the court, the judge has lifted the blindfold, and seeing a relative or friend or some person with influence, the judge tips the scale and puts them on a special track for favored handling. This is corruption at the core of our system of impartial equal justice, and is intolerable. It is our duty to denounce the misconduct in no uncertain terms and to sanction it as the grave ethical violation that it is, in our best effort to ensure evenhanded justice, starting at the very point of access to the judge. That is the reason we impose the most severe sanction on Judge Wasilenko available to us under the circumstances.
The court clerk who was summoned to bring Heather Robinson’s file to Judge Wasilenko’s chambers knew of the father/daughter relationship between the judge and the defendant. Describing her reaction to witnessing the private handling by the judge of the case in chambers, the clerk testified before the masters that she “was mad after it happened” because she had just paid her own daughter’s ticket and she “just didn’t like it.” The evil inherent in a two-track system of justice is so apparent; people “just don’t like it” because it is so clearly wrong—yet these simple points obviously elude Judge Wasilenko.

Counts Two, Three, Four, Five, Nine, 10

In these six counts, the masters applied the Supreme Court’s three-prong standard for willful misconduct—(1) unjudicial conduct, (2) committed in bad faith, (3) while acting in a judicial capacity (see discussion, ante, at p. 46)—and found it satisfied. We reach the same conclusions for the same, and additional, reasons. We separately analyze the three parts of the test to show how each is satisfied.
Unjudicial Conduct: The masters concluded, as do we, that by affording family, friends and others with special connections access to a preferential track of justice, Judge Wasilenko violated canon 1 (requiring that a judge maintain high standards of conduct so as to uphold the integrity and independence of the judiciary), canon 2A (requiring a judge to respect and *CJP Supp. 52 comply with the law and to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary), and 2B(1) (prohibiting a judge from allowing family, social or other relationships to influence the judge’s judicial conduct or judgment, and prohibiting a judge from conveying or permitting others to convey the impression that any individual is in a special position to influence the judge) in all six counts. Those violations make the conduct unjudicial.
There were additional violations of the canons as follows:
Canon 3E(1): This canon requires a judge to disqualify himself or herself in any proceeding in which disqualification “is required by law.” As noted by the masters, the cross-reference “as required by law” includes Code of Civil Procedure section 170.1, subdivision (a)(6)(C), requiring disqualification if “[f]or any reason . . . [][] [a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial.” In count two, the judge was handling a case not assigned to him, involving Heather Robinson, whom he considered a daughter. The judge was disqualified from handling the case based on his close relationship with the defendant. The masters so concluded and we agree. Additionally, Judge Wasilenko concedes he should have disqualified himself from hearing Nathan Sokoloski’s case (count five). The masters concluded that his failure to do so violated canon 3E(1), and we agree.
Canon 3E(2): Even in instances where disqualification is not required under canon 3E(1), a judge is obligated under canon 3E(2), in all trial court proceedings, to “disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no actual basis for disqualification.” The masters concluded, as do we, that Judge Wasilenko violated this canon by failing to disclose on the record the nature of his relationships with Casey Landis and Landis’s parents in counts three and four, the long-term relationships between Erin Porter, her family, and the judge and his family in count nine, and similar personal and familial cross-connections with Kris Kraus in count 10.
Canon 3B(7): We have discussed previously (ante, at p. 45) our reluctance to make conclusions on the current record concerning violations of canon 3B(7) (prohibiting ex parte communications) in the instances where the defendant appeared without counsel and did not contest a straight traffic infraction matter. These are the matters in which the district attorney does not appear. In cases where a misdemeanor also is charged, however, the district attorney does appear, and thus there is no issue of any implied consent by the prosecutor to ex parte communication with the defendant. Accordingly, the *CJP Supp. 53 masters found the ex parte communications in count five—where Nathan Sokoloski was charged with misdemeanors—to be in violation of canon 3B(7), and we agree.[4]
The combined violations of the foregoing canons make Judge Wasilenko’s conduct “unjudicial” and satisfy the first of the three requirements for willful misconduct.
Bad Faith: The masters’ application to the facts of the “bad faith” portion of the test for willful misconduct led them to conclude that Judge Wasilenko acted in bad faith in these six counts, and we agree for the reasons stated by the masters as well as on additional grounds. As a starting point, the masters concluded in all six counts that Judge Wasilenko’s handling of each of the cases was for the purpose of providing an expedited, convenient, favored procedure for a family member or friend or other person with special access to him. The establishment of this two-track procedural system, although not labeled as such by the masters, was found by them to be for a corrupt purpose, that is, not for the faithful discharge of judicial duty. We agree. By definition, such a corrupt purpose constitutes bad faith.
Additionally, the masters found, as do we, that Judge Wasilenko conferred favored substantive treatment on three of the defendants involved in these six counts by not imposing the $10 statutory correction fee on them. Included within this class of special beneficiaries was the judge’s surrogate daughter, Heather Robinson (count two), who, as the masters note, was not even at the courthouse when her case was dismissed. The judge’s friend Erin Porter (count nine) and friend and former neighbor Kris Kraus (count 10) also received this substantive benefit. The conferring of this additional favoritism further confirms the judge’s corrupt purpose and bad faith.
As the masters and we have noted, none of the cases involved in these six counts was assigned to Judge Wasilenko and none would have come before him in the ordinary course of judicial business. We have stated our conclusion that the judge therefore abused his power. At least in the context of the patterned behavior here, the repeated abuse cannot be deemed to be consistent with the faithful discharge of judicial duty, and constitutes bad faith.
Judicial Capacity: The creation of the favored procedural and substantive tracks by Judge Wasilenko in these six counts was done by him in his judicial capacity. The masters so concluded, as do we. Judge Wasilenko was able to fashion the special treatment in these six counts by reason of the *CJP Supp. 54 power of his office. He acted in his judicial capacity, notwithstanding the gross impropriety of his actions.
Judge Wasilenko committed willful misconduct in counts two, three, four, five, nine and 10.

Counts Six, Seven, Eight

The masters concluded that Judge Wasilenko committed prejudicial misconduct in these three counts. The defendants—Ryan Heenan, Timothy Goetz and Anthony Franks—all had been charged with misdemeanor offenses. All three had failed to appear and warrants for their arrest had issued in all three cases; in counts six and eight, the warrants had been sent to law enforcement. The judge recalled the warrants in all three cases and in counts six and seven, he diverted the youthful alcohol offenders to the Pathways program.
The masters found that in each instance, the judge’s actions “were in good faith” because “they were done for the purpose of making certain that a young man that had good cause for failing to appear was not placed at risk of being arrested and booked on a bench warrant.” In counts six and seven, there was an additional purpose, according to the masters, which was to ensure that the young men were “not denied the opportunity to attend the Pathways program to which similarly situated young men are routinely referred.” They find that none of the three received treatment that they would not have received from a different judge with Veronica Henderson as the prosecutor.
We respectfully disagree with the masters to the extent that we conclude that all three counts involve willful misconduct. We reach that conclusion by analyzing again the three-prong test for willful misconduct.
Unjudicial Conduct: The masters concluded that the judge violated canons 1 and 2A in each count, and we agree. In addition, we find the conduct violated canon 2B(1), which contains two prohibitions—the first of which provides that a judge “shall not allow family, social, political, or other relationships to influence the judge’s judicial conduct or judgment,” and the second of which states that a judge shall not “convey or permit others to convey the impression that any individual is in a special position to influence the judge.” (Italics added.) The judge did not know any of the three defendants—Heenan, Goetz or Franks. Prior to putting each defendant on a preferential track, however, he learned that Heenan and Goetz were passengers in the car driven by the judge’s Mend Nathan Sokoloski, and that they were codefendants with Sokoloski, and that Franks was a friend of the judge’s surrogate daughter, Heather Robinson.
*CJP Supp. 55 In each count, the masters expressly found that the judge did not allow his relationship with each defendant to influence his judicial conduct or judgment in violation of canon 2B(1). We accept the masters’ conclusion. The masters do not discuss the further point of whether the judge was influenced by his relationship with the defendants’ friends. Accordingly, there is no basis for concluding that the first portion of canon 2B(1) was violated in any of the three counts.
As to the second proscription of the canon, however, we are of the opinion, based on the masters’ description of the facts and our reaction to them, that Judge Wasilenko, by his actions, did “convey the impression” that his friends, the Sokoloski family, were in a “special position to influence” his handling of the Heenan and Goetz matters, and that by reason of his father/daughter relationship with Heather Robinson, she was similarly situated to influence him respecting the Franks matter. It looks to us—that is to say the judge did “convey the impression”—that upon learning of the special relationships, he afforded the special handling. We conclude that the judge did violate the second proscription of canon 2B(1).
In addition, since Heenan, Goetz and Franks all were charged with one or more misdemeanors, the district attorney’s policy of not appearing in pure infraction cases was inapplicable. As with count five discussed previously (ante, at pp. 52-53), there is no basis therefore for finding consent by the prosecutor to the ex parte communications that took place in these counts. Accordingly, we find the judge violated canon 3B(7) in each of these three counts.
These combined violations of the canons constitute unjudicial conduct and satisfy the first part of the test for willful misconduct.
Bad Faith: The masters concluded that Judge Wasilenko’s motivation in these three counts was to use his judicial power to save the defendants the trauma of being booked into jail on the outstanding warrants, and in counts six and seven, additionally to protect Heenan’s and Goetz’s opportunities for diversion to the Pathways youth alcohol program.[5] They find that the judge was acting in “good faith” in taking steps to realize these objections; we understand this to be the masters’ characterization of the judge’s subjective intent.
We agree with the masters’ conclusion that the judge was acting to spare these young men the trauma of being booked, and to afford Heenan and *CJP Supp. 56 Goetz access to Pathways. However, we believe that there is a preliminary consideration concerning the reason the judge interceded on behalf of all three defendants. In that regard these three counts are indistinguishable from the other six counts involving willful misconduct, namely, that he was doling out preferential treatment because of special connections. It is true that Judge Wasilenko was not directly acquainted with the three defendants here. However, each of these three defendants had a direct and close link to the judge’s family and close friends. The trigger point for the preferential treatment was the judge’s realization of those connections. Thus, the conduct in these three counts appears to us to be part and parcel of the same two-track system based on connections leading to special access as the first six counts we discussed. The conduct cannot be reconciled with the faithful discharge of judicial duty and constitutes bad faith.
We have already noted our agreement with the masters’ interpretation of the Yuba County court policy concerning bookings on bench warrants that have gone to law enforcement (see discussion, ante, at p. 40), namely, that a judge, but not a clerk, retains discretion under the policy to excuse a defendant from being booked on a bench warrant upon a showing of good cause for the failure to appear. The masters’ determination that the judge acted in good faith and their explanation of his intent in these three counts appears to rest on an assumed exercise of such discretion. Judge Wasilenko, however, abused his discretion since none of these cases was legitimately before him. A judge to whom the cases might be assigned might exercise discretion to recall the warrants to avoid the booking and arrest of the defendants, but Judge Wasilenko did not have such discretionary authority. In our view, the judge’s actions in these three counts are part of the broad pattern of improperly diverting nonassigned cases to himself. That improper course of conduct constitutes a serious abuse of authority that is the antithesis of the “faithful discharge of judicial duty.” The gauge of judicial misconduct rests on an objective standard (Furey v. Commission on Judicial Performance (1987) 43 Cal.3d 1297, 1304 [240 Cal.Rptr. 859, 743 P.2d 919]) and we conclude that the judge acted in bad faith as a matter of law.
Since these three cases involved misdemeanors, there was no consent by the district attorney to the judge’s ex parte communications with these three defendants in chambers. It was totally improper for them to have had the direct access to chambers—and it was only by that means that they avoided going through the clerk’s office as a prerequisite for getting on a walk-in or other court calendar. Since the warrants for Heenan’s and Franks’s arrests already had gone to law enforcement, they avoided being booked only because they went to chambers. Thus, the two of them did receive a substantially lenient treatment from Judge Wasilenko. They would not have received a similar disposition from another judge because they could not have had their cases heard by another judge without being booked first.
*CJP Supp. 57 Judicial Capacity: Judge Wasilenko was able to create the favored procedural and substantive tracks in these three counts by reason of the power of his office. He acted in his judicial capacity, notwithstanding that his conduct was seriously unethical.
Judge Wasilenko committed willful misconduct in counts six, seven and eight.

Count One

We agree with the masters that Judge Wasilenko created an appearance and impression that he was providing his close relative, Sheila Messick, with favored treatment in the resolution of her traffic citation, a case not assigned to him. He did this by having a clerk bring her file to his chambers, where he was alone with Messick, and then discussing the ticket with her in a private meeting. The judge violated canons 1, 2A and 2B(1). However, the judge took no action on his relative’s ticket; he only confirmed with her what her options were. Messick left the judge’s chambers, paid her fine and attended traffic school. We concur with the masters that this misconduct constitutes improper action. As such, however, it cannot form the basis of the censure and bar we impose on Judge Wasilenko. Under the constitution, that level of discipline may rest only on prejudicial or willful misconduct. (Cal. Const., art. VI, § 18, subd. (d).)
III. Discipline
We examine the question of the appropriate level of discipline to impose on Judge Wasilenko in the context of the purposes of commission disciplinary proceedings, which have been described by the Supreme Court as “protection of the public, ensuring evenhanded and efficient administration of justice, and the maintenance of public confidence in the integrity of the judicial system.” (Kloepfer, supra, 49 Cal.3d at pp. 864-865.) The disposition of a judicial disciplinary case “depends in large measure on the nature and number of charges found to be true.” (Furey v. Commission on Judicial Performance, supra, 43 Cal.3d at p. 1307, fn. 2.) “The number of wrongful acts is relevant to determining whether they were merely isolated occurrences or, instead, part of a course of conduct establishing ‘lack of temperament and ability to perform judicial functions in an even-handed manner.’ [Citation.]” (Wenger v. Commission on Judicial Performance (1981) 29 Cal.3d 615, 653 [175 Cal.Rptr. 420, 630 P.2d 954].)
Whereas an isolated incident of wrongdoing may arise from a momentary ethical lapse, a continuing pattern as engaged in by Judge Wasilenko “reflects poor judgment and lack of judicial temperament.” (Kloepfer, supra, 49 Cal.3d at p. 848.)
*CJP Supp. 58 Recognizing that Judge Wasilenko has retired from the bench, the question of “suitable judicial temperament” remains relevant to the question of whether a censure and bar are necessary and appropriate. A further factor to be considered in terms of whether the judge manifests unsuitability for the bench is the judge’s inability or unwillingness to change behavior after less severe discipline by the commission. (See Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 339-340 [45 Cal.Rptr.2d 254, 902 P.2d 272] (Doan) [removal of judge who failed to learn from prior discipline for similar misconduct]; McCullough, supra, 49 Cal.3d at p. 199 [failure of judge to respond to prior public censure “evidences a lack of regard for the Commission, [the Supreme Court] and [the judge’s] obligations as a judge”].)
Applying the foregoing considerations to Judge Wasilenko’s misconduct, we conclude that a censure and bar, the maximum discipline available to us under the circumstances, is the appropriate discipline. The censure is our effort to repair the past damage to the reputation of the judiciary, and the bar is in order to safeguard the public going forward by precluding Judge Wasilenko from being a bench officer in this state in the fiiture.
Judge Wasilenko committed nine incidents of willful misconduct. The masters found, and we concur, that the judge engaged in a “pattern of misconduct in which the Judge repeatedly favored his friends with procedural shortcuts that were not available to citizens that had no relationship with the Judge.” We agree with the masters that there also were several instances where the judge afforded substantive breaks to the favored few. There is also the pattern, repeated in every count, of Judge Wasilenko diverting nonassigned cases to himself for his specialized handling. The overall scope of wrongdoing is alarming.
Judge Wasilenko was privately admonished by the commission in 1993 for misconduct that is remarkably similar in three respects to that which is present here. The earlier discipline was based on wrongdoing that included (1) transferring to his own court in 1992 two cases in which the judge’s friends were the defendants, without notice to the district attorney, following an ex parte conversation with one of the friends about a recent driving under the influence arrest, (2) presiding in 1990 over a criminal matter in which his courtroom clerk was the defendant, without disclosing this basis of the disqualification on the record and without obtaining a written waiver of disqualification from both parties and (3) meeting ex parte with probation officers to discuss their presentence reports. The admonishment stated that “the commission noted with approval that Judge Wasilenko demonstrated awareness of these problems and a willingness to improve.” (Italics added.)
In light of the judge’s conduct in the cases here, during the period 1999 to 2002, and his testimony before the masters, he demonstrates he lacks *CJP Supp. 59 awareness of the problems and is either unwilling or unable to improve. At the hearing before the masters, although Judge Wasilenko recalled the 1990 incident concerning which he was disciplined for failing to disclose on the record, he disputed the similarity between that incident and his current failure to disclose on the record his familial relationship with Heather Robinson (count two). He further demonstrated his lack of awareness when, at the masters’ hearing, he did not even recall the occasion in 1992 when he transferred his friends’ cases to his courtroom following an ex parte communication.
A judge’s failure or inability to reform suggests unsuitability for judicial office. (Platt, supra, No. 162 at pp. 15-16 [48 Cal.4th CJP Supp. at pp. 248-249]; accord, Doan, supra, 11 Cal.4th at pp. 339-340; McCullough, supra, 49 Cal.3d at p. 197.) The Supreme Court has said that in instances where, as here, the record does not suggest the judge “has, or will be able to, overcome” the trait leading to the misconduct, and “that similar incidents will not recur ...[,] comparison of the discipline imposed in other cases ... is not fruitful.” (Kloepfer, supra, 49 Cal.3d at pp. 866-867.) Nevertheless, a review of earlier decisions confirms that the types of misconduct we confront here do support removal or censure/bar.
Three years ago, we removed Judge Platt from office for establishing a similar two-track system of justice by handling and attempting to influence traffic and other cases involving family and friends on a preferential basis. (Platt, supra, No. 162 [48 Cal.4th CJP Supp. 227] .)[6] The Supreme Court also has removed judges who engaged in misconduct in connection with the granting of preferential treatment based on friendship or influence.
In Spruance v. Commission on Judicial Qualifications (1975) 13 Cal.3d 778 [119 Cal.Rptr. 841, 532 P.2d 1209] (Spruance), the judge was removed from office for numerous acts of misconduct, several of which included special treatment for himself as a defendant before another judge (id. at pp. 794, 799), as well as dispensing special treatment for friends and political supporters (id. at pp. 790-791 & fn. 11, 792-793, 798), and attempting to persuade the prosecutor to reduce charges against a friend in a case not pending before the judge (id. at pp. 790, fn. 10, 798). The judge in Gonzalez v. Commission on Judicial Performance, supra, 33 Cal.3d at pages 366-368, 370, 378, also was removed for misconduct that included attempts by the judge to intercede in criminal matters on behalf of friends and benefactors.
*CJP Supp. 60 In Doan, supra, 11 Cal.4th 294, the judge was removed; the misconduct included ex parte contacts with her former gardener (and others) and acting as an advocate for the gardener, including initiating efforts for his O.R. release, failing to disqualify herself or make requisite disclosures, and manipulating the bail review hearing over which she presided in order to accomplish an O.R. release. (Id. at pp. 316-319.) Judge Doan also presided over the pretrial conference, and attempted to influence its outcome, in a case in which the defendant was a close friend of a nephew who had loaned the judge money. (Id. at pp. 320-323.) In McCullough, supra, 49 Cal.3d 186, 192-193, the judge was removed for misconduct that included special handling of a friend’s misdemeanor case following an improper ex parte communication; the judge continued the case for more than two years and then dismissed it without explanation.
Spruance, Gonzalez, Doan and McCullough all involved misconduct beyond the preferential treatment afforded specially situated defendants. Nonetheless, it is clear that such wrongdoing constitutes a basis for removal, since as the court stated in Spruance, “Mere censure . . . would woefully fail to convey our utter reproval of any judge who allows malice or other improper personal motivations to infect the administration of justice.” (Spruance, supra, 13 Cal.3d at p. 802.)
IV. Conclusion
In light of Judge Wasilenko’s retirement from the bench, we hereby impose a censure on him as the maximum discipline we can impose. Because of his demonstrated failure to reform, and his long-running pattern of misconduct, we determine that he is lacking in requisite judicial temperament, and therefore, to protect the public from his ever sitting as a bench officer, we hereby bar him from any assignment, appointment or reference of work from any California state court.
Commission members Justice Vance W. Raye, Mr. Marshall B. Grossman, Judge Frederick P. Horn, Mr. Michael A. Kahn, Mrs. Crystal Lui, Ms. Patricia Miller, Mr. Jose C. Miramontes, Mrs. Penny Perez, Judge Rise Jones Pichón, and Ms. Barbara Schraeger voted to impose a censure and bar. There is currently one public member vacancy on the commission.

 The commission has been advised that Judge Wasilenko has been absent from the bench since mid-May 2004 pursuant to his physician’s orders and that his nonappearance at the oral argument was due to health-related issues.

 Robinson’s expired registration is an example of such a “correctable offense.” Upon submission of proof of correction of the violation, that is, evidence of reregistration of the vehicle, the case may be dismissed.

 The bracketed findings are ours. They are supported by testimony and we find them relevant. It is particularly significant that the clerks cannot waive the $10 fee if a person comes to their windows. By going directly to chambers, several of the defendants escaped paying the $10 fee through an exercise of (assumed) discretion by Judge Wasilenko that otherwise would not be available from a clerk in the clerk’s office. The judge’s surrogate daughter, Heather Robinson, did not even need to go to chambers to get this benefit (count two).

 By a parity of reasoning, we find violations of canon 3B(7) in counts six, seven and eight because they also all involved misdemeanor violations. (See discussion, post, at p. 55.)

 It is unclear that preservation of the option of referral to the Pathways program necessitated any action by Judge Wasilenko from chambers. At such time as the two defendants appeared properly and in due course before an assigned judge, the referral would appear to have been the standard practice in the county.

 Judge Platt was found to have committed five acts of willful misconduct and one act of prejudicial misconduct in connection with dismissing or attempting to dismiss four traffic tickets, requesting another judge to grant an O.R. release to a defendant, and mentioning in a telephone conversation with a court commissioner that a friend had received a traffic ticket.